No. 25-2937

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

ILLINOIS POLICY INSTITUTE *and*
THE TECHNOLOGY & MANUFACTURING ASSOCIATION,

Plaintiffs-Appellants,

v.

JANE R. FLANAGAN, *in her official capacity as
Director of the Illinois Department of Labor*,

Defendant-Appellee.

On Appeal from the United States District Court
for the Northern District of Illinois
No. 1:24-cv-06976
Honorable Franklin U. Valderrama

**Appellants' Brief and Required Short Appendix**

Jeffrey M. Schwab
James McQuaid
LIBERTY JUSTICE CENTER
7500 Rialto Blvd., Suite 1-250
Austin, Texas 78735
512-481-4400
jschwab@ljc.org
jmcquaid@ljc.org

*Attorneys for Plaintiffs-Appellants*

**Disclosure Statement**

1.      The full name of every party the undersigned attorney represents in the case: Plaintiffs-Appellants Illinois Policy Institute and the Technology & Manufacturing Association.

2.      The name of all law firms whose partners or associates have appeared on behalf of the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this Court: the Liberty Justice Center.

3.      If the party or amicus is a corporation: Illinois Policy Institute is a 501(c)(3) not-for-profit corporation, and the Technology & Manufacturing Association is a 501(c)(6) independent trade corporation. Neither has a parent corporation, and no publicly held company owns 10% or more of their stock.

/s/ Jeffrey M. Schwab

Jeffrey Schwab
LIBERTY JUSTICE CENTER
7500 Rialto Blvd.
Suite 1-250
Austin, Texas 78735
512-481-4400
jschwab@ljc.org

*Counsel for Plaintiffs-Appellants*

# Table of Contents

Disclosure Statement.................................................................................i

Table of Authorities ............................................................................. iv

Jurisdictional Statement.........................................................................1

Statement of Issues Presented for Review ..................................................1

Statement of the Case .............................................................................2

    A.    The Illinois Worker Freedom of Speech Act prohibits certain employer speech based on its content..........................................2

    B.    Plaintiffs have engaged in speech prohibited by the Act and wish to continue doing so. ..............................................5

    C.    Procedural History .......................................................7

Summary of Argument ............................................................................9

Argument ............................................................................................11

    I.    The *Ex parte Young* exception to sovereign immunity applies to Plaintiffs' claims against the Director .................................12

        A.    The Director has a sufficient enforcement connection to the Act under *Ex parte Young* ..................................12

            1.    The Act's text grants the Director concrete enforcement authority........................................13

            2.    The Act fits the familiar "right-to-sue" model where the gatekeeping agency also enforces the law .....................16

            3.    The Act's penalty structure confirms the Director is an enforcement official, not a neutral clerk .....................20

            4.    *Whole Woman's Health* supports, rather than undermines, treating the Director as an enforcement official ...........................................................21

        B.    *Ex parte Young* requires an ongoing enforcement regime and prospective relief, not a personal threat to Plaintiffs ...............24

1.  The ongoing violation required by *Ex parte Young* here is the Director's administration of the Act's enforcement regime ........................................................... 24

2.  The district court improperly converted *Ex parte Young's* "ongoing violation" requirement into a "threatening" test ......... 27

3.  Article III's "credible threat" standard does not require an individualized enforcement threat from a defendant state official .................................................... 30

II.  Other federal courts have rejected similar sovereign-immunity arguments in challenges to captive audience bans .............................................. 36

III.  States cannot evade pre-enforcement review by outsourcing enforcement to private parties ................................ 40

Conclusion ....................................................... 44

Certificate of Compliance ........................................ 46

Certificate of Service ........................................... 47

Statutory Addendum .............................................. 48

Required Short Appendix .......................................... 53

# Table of Authorities

## Cases

*281 Care Comm. v. Arneson*, 638 F.3d 621 (8th Cir. 2011) ......................................... 14

*303 Creative LLC v. Elenis*, 600 U.S. 570 (2023) ......................................... 31

*ACLU v. Alvarez*, 679 F.3d 583 (7th Cir. 2012)................................................31, 40, 43

*Apex Digital, Inc. v. Sears, Roebuck & Co.,* 572 F.3d 440 (7th Cir. 2009) ................ 36

*Babbitt v. UFW Nat'l Union*, 442 U. S. 289 (1979) ....................................31, 34–35, 40

*Brown v. Kemp*, 86 F.4th 745 (7th Cir. 2023)........................................................ 31–34

*Ctr. for Individual Freedom v. Madigan*, 697 F.3d 464 (7th Cir. 2012) ................... 40

*Chamber of Commerce of the United States of America v. Bartolomeo,*
   No. 3:22-cv-1373 (D. Conn., June 28, 2023) ................................................37

*Chapman v. Chi. Dep't of Fin.*, 2023 IL 128300 ..........................................................16

*Chi. Teachers Union, Local No. 1 v. Bd. of Educ.*, 2012 IL 112566.............................16

*Council 31 of the Am. Fed'n of State, Cnty. & Mun. Emps. v. Quinn,*
   680 F.3d 875 (7th Cir. 2012) ................................................................... 11, 12

*Doe v. Holcomb*, 883 F.3d 971 (7th Cir. 2018) ....................................12, 20, 23, 27–28

*Driftless Area Land Conservancy v. Valcq,* 16 F.4th 508 (7th Cir. 2021) ...... 25, 28, 29

*Ex parte Young*, 209 U.S. 123
   (1908) ................................ 1, 2, 8–12, 14–15, 20–25, 27–30, 32, 34, 36, 38–39, 41–44

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ................................................ 31

*Goldhamer v. Nagode*, 621 F.3d 581 (7th Cir. 2010) .................................................. 40

*Green v. Mansour,* 474 U.S. 64 (1985)........................................................................ 43

*Kucharek v. Hanaway*, 902 F.2d 513 (7th Cir. 1990)................................................. 33

*Majors v. Abell*, 317 F.3d 719, 721 (7th Cir. 2003) ............................................. 29, 36

*MedImmune, Inc. v. Genentech, Inc.,* 549 U.S. 118 (2007)...............................32

*Minn. Chapter of Associated Builders v. Ellison,* 153 F.4th 695 (8th Cir. 2025) ....................................................................... 37–39

*Mueller v. City of Joliet*, 943 F.3d 834 (7th Cir. 2019)................................ 16

*NRA of Am. v. Vullo*, 602 U.S. 175 (2024) ........................................ 42, 43, 44

*People v. Gutman,* 2011 IL 110338.............................................................17

*Reprod. Health Servs. of Planned Parenthood of the St. Louis Region, Inc. v. Nixon*, 428 F.3d 1139 (8th Cir. 2005)........................................14

*Rodgers v. Bryant*, 942 F.3d 451 (8th Cir. 2019)..................................... 33

*Sherman v. Community Consolidated School District 21 of Wheeling Township,* 980 F.2d 437 (7th Cir. 1992) ........................................28

*Sherwood v. Marchiori*, 76 F.4th 688, 693 (7th Cir. 2023)......................... 11

*Silha v. ACT, Inc.*, 807 F.3d 169 (7th Cir. 2015) ...................................... 11

*Steffel v. Thompson*, 415 U.S. 452 (1974) ........................................... 30, 36

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014)................... 31, 33, 34

*Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635 (2002) .............................................................10, 12, 23–25, 28–30

*Va. Office for Prot. & Advocacy v. Stewart,* 563 U.S. 247 (2011)................... 25

*Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383 (1988)............................31, 34–36, 40

*Whole Woman's Health v. Jackson*, 595 U.S. 30 (2021) ........................... 11, 21–24, 30, 33, 35–37, 41, 42, 44

**Statutes**

*Federal*

28 U.S.C. § 1291 ............................................................................... 1

28 U.S.C. § 1331 ............................................................................... 1

28 U.S.C. § 1343 ............................................................................................. 1

29 U.S.C. § 626 ............................................................................................. 18

42 U.S.C. § 1983 ............................................................................................ 1

42 U.S.C. § 2000e-5 ................................................................................. 17, 18

42 U.S.C. § 2000e-8 .................................................................................... 17

42 U.S.C. § 2000e-9 .................................................................................... 17

42 U.S.C. § 12117 ........................................................................................ 18

*State*

775 ILCS 5/1-101 ......................................................................................... 18

775 ILCS 5/7A-102 ...................................................................................... 18

775 ILCS 5/8-111 ......................................................................................... 18

775 ILCS 5/8A-104 ...................................................................................... 19

820 ILCS 40/2 .............................................................................................. 19

820 ILCS 40/12 ...................................................................................... 19, 20

820 ILCS 57/1 ........................................................................................... 2, 48

820 ILCS 57/10 ........................................................................... 2–4, 34, 48

820 ILCS 57/15 ......................................................................................... 2, 49

820 ILCS 57/20 .............................................................................. 3, 32, 41, 49

820 ILCS 57/25 ............................... 3, 4, 8–10, 13–16, 20–24, 26–27, 29, 34–35, 39, 50

820 ILCS 57/30 ......................................................................................... 3, 51

820 ILCS 57/35 ...................................................................................... 4, 5, 51

820 ILCS 180/1 ............................................................................................ 19

820 ILCS 180/20 .......................................................................................... 19

820 ILCS 180/30 ......................................................... 19

Conn. Gen. Stat. § 31-51q ......................................... 37

Conn. Gen. Stat. § 31-69a ......................................... 37

Minn. Stat. § 175.20 ................................................... 38

Minn. Stat. § 181.531 ................................................. 38

**Rules**

Fed. R. Civ. P. 12 ................................................ 11, 36

Fed. R. Civ. P. 58 ....................................................... 1

**Other Authorities**

Leah M. Litman, *Privately Enforced Laws and the Future of Pre-Enforcement Review*, 131 Yale L.J.F. 1 (2021) ............................. 43

## Jurisdictional Statement

The United States District Court for the Northern District of Illinois had jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims allege violations of the First and Fourteenth Amendments to the United States Constitution; and 28 U.S.C. § 1343, because relief is sought under 42 U.S.C. § 1983. This Court has jurisdiction pursuant to 28 U.S.C. § 1291 because Plaintiffs filed a timely Notice of Appeal on October 27, 2025, of the district court's September 30, 2025 Order granting Defendants' motion to dismiss, S.A. 1–25, and its Judgment, dated November 4, 2025[1], S.A. 26.

## Statement of Issues Presented for Review

1.  Under *Ex parte Young,* a state official who plays a nontrivial role in enforcing a challenged statute may be sued for prospective relief. The Act commands the Director to receive complaints, oversee the 180-day enforcement process, and institute actions to collect statutory penalties payable to the Department. Did the district court err by deeming these enforcement duties merely ministerial and concluding that sovereign immunity bars this pre-enforcement First Amendment challenge?

2.  *Ex parte Young's* "ongoing violation of federal law" requirement is met when a state official presently administers an enforcement regime alleged to conflict

---

[1] Plaintiffs filed their notice of appeal after the district court granted Defendant's motion to dismiss "without prejudice and without leave to amend." S.A. 25. After this Court, on October 30, 2025, entered an order indicating that the district court had not entered a judgment under Fed. R. Civ. P. 58, Dkt. 2, the parties, on November 4, 2025, filed a consent motion to enter judgment before the district court, S.A. 27, which it granted and entered judgment that same day, S.A. 29.

with federal law. Here, any "interested party" may initiate a complaint process the Director must administer and may culminate in statutory penalties payable to the Department. Did the district court err in finding no ongoing violation because the Director is not "about to commence" enforcement proceedings against Plaintiffs?

## Statement of the Case

### A. The Illinois Worker Freedom of Speech Act prohibits certain employer speech based on its content.

Illinois enacted the "Worker Freedom of Speech Act," 820 ILCS 57/1 *et seq.* (the "Act"), which went into effect on January 1, 2025. The Act broadly prohibits employers from speaking to their employees about "religious or political matters" in any mandatory setting. Specifically, the Act prohibits an employer from "discharg[ing], disciplin[ing], or otherwise penaliz[ing]," threatening to do so, or "tak[ing] any adverse employment action" against an employee who refuses to attend meetings or receive communications from the employer intended "to communicate the opinion of the employer about religious matters or political matters." 820 ILCS 57/15.

"Political matters" include not only speech about campaigns and elections, but also to speech "relating to . . . proposals to change legislation, proposals to change regulations, proposals to change public policy, and the decision to join or support any political party or political, civic, community, fraternal, or labor organization." 820 ILCS 57/10. "Religious matters" are defined as "matters relating to religious belief, affiliation, and practice and the decision to join or support any religious

organization or association." 820 ILCS 57/10. Employers must also post a notice of employee rights under the Act. 820 ILCS 57/30.

The Act allows any "aggrieved employee" to bring a civil action to enforce its provisions within one year after the date of the alleged violation on their own behalf or on behalf of other employees. Such employees may obtain from a court "all appropriate relief, including injunctive relief, reinstatement to the employee's former position or an equivalent position, back pay, [and] reestablishment of any employee benefits." The court may also award attorney's fees and costs to a prevailing employee. 820 ILCS 57/20.

The Act also allows an "interested party"—defined as "an organization that monitors or is attentive to compliance with public or worker safety laws, wage and hour requirements, or other statutory requirements," 820 ILCS 57/10—to submit a complaint to the Illinois Department of Labor (the "Department") against an employer for violating the Act. 820 ILCS 57/25. Once an interested party has done so, the Department must "inquire into [those] alleged violations" and "institute the actions for the penalties provided in this Section and to enforce the provisions of th[e] Act." 820 ILCS 57/25. The Department must send a notice of the complaint to the employer allegedly in violation of the Act. 820 ILCS 57/25(b)(2). The employer allegedly in violation of the Act has 30 days from the receipt of such notice to cure or contest the complaint. 820 ILCS 57/25(b)(3). The Department then must issue a notice of right to sue to the interested party if one or more of the following has occurred: (1) the employer has "cured the alleged violation" to the satisfaction of the

Director of Labor ("Director"); (2) the Director has "determined that the allegation is unjustified or that the Department does not have jurisdiction over the matter or the parties"; or (3) the Director determines that the allegation is justified or has not made a determination and "either has decided not to exercise jurisdiction over the matter or has concluded administrative enforcement of the matter." 820 ILCS 57/25(b)(4).

After 180 days from the Department's service of the notice of action to the employer, the interested party may sue for civil penalties. 820 ILCS 57/25(c). For each violation—with each affected employee constituting a separate violation—the employer is subject to a $1,000 civil penalty "payable to the Department," with "10% of any statutory penalties" plus attorney's fees and expenses awarded to the prevailing interested-party plaintiff. 820 ILCS 57/25(a), (e).

The Act contains several narrow exceptions. Employers may communicate with their employees about religious and political matters, but only if such communication is "voluntary," 820 ILCS 57/35(2)—meaning that the action is not incentivized by a positive change in any employment condition, including any compensation or benefit and that the action is not taken under threat of a negative change in any employment condition, 820 ILCS 57/10. The Act also allows employers to communicate "information that the employer is required by law to communicate," 820 ILCS 57/35(1), and "information that is necessary for the employees to perform their required job duties" to employees, 820 ILCS 57/35(3).

The Act exempts any political organization, political party organization, caucus organization, candidate political organization, or "not-for-profit organization exempt from taxation under Section 501(c)(4), 501(c)(5), or 501(c)(6) of the Internal Revenue Code" with respect to speech "communicating the employer's political tenets or purposes." 820 ILCS 57/35(6). The Act also exempts "religious organizations" (which it does not define) for speech "communicating the employer's religious beliefs, practices, or tenets." 820 ILCS 57/35(8). It also exempts the General Assembly and State or local legislative or regulatory bodies with respect to communications of the employer's proposals to change legislation, regulations, or public policy. 820 ILCS 57/35(7).

The Act also does not prohibit an employer from "requiring its employees to attend any training intended to foster a civil and collaborative workplace or reduce or prevent workplace harassment or discrimination." 820 ILCS 57/35(4). And an institution of higher education may conduct meetings or communicate with its employees "concerning any coursework, symposia, research, publication, or an academic program at the institution." 820 ILCS 57/35(5).

**B.    Plaintiffs have engaged in speech prohibited by the Act and wish to continue doing so.**

The Illinois Policy Institute (the "Institute") is an Illinois 501(c)(3) nonprofit research organization that produces and disseminates policy work on core political issues—including the state budget, labor, taxes, education, and criminal justice— from a perspective favoring limited government, free markets, and workers' freedom of association. S.A. 31, 36. The Institute holds weekly all-staff mandatory meetings,

mandatory team and strategy meetings, and twice-yearly mandatory staff retreats. S.A. 36. Before the Act took effect, these mandatory meetings and retreats often included communication about the organization's views on public policy, including among other things, the Workers' Rights Amendment, a proposed Chicago real-estate transfer tax, and tax-credit scholarship legislation—all "proposals to change legislation" or "public policy" squarely within the Act's definition of "political matters." S.A. 34, 36. These meetings are now unlawful under the Act. Although the Act has an exception for communications that are "necessary for employees to perform their required job duties," not all the communications at the Institute's meetings are necessary for every employee present to do their job; many employee's job responsibilities do not directly involve each political matter discussed. S.A. 6–7. Still, communicating these political matters to all staff at mandatory gatherings is important to the Institute's functioning and efficiency. S.A. 36. The Institute wants every employee to know what its various teams and experts are working on, and the organization's work product improves when staff not assigned to a particular policy issue can contribute ideas or perspectives. S.A. 36–37. Team morale, connection to the organization, and idea generation would all suffer if the Institute were required to conduct staff meetings without providing policy-related information to all staff. S.A. 7.

The Technology & Manufacturing Association (the "Association") is an Illinois 501(c)(6) trade association representing small and mid-size manufacturers. S.A. 31, 37. The Association itself is exempt under the Act as a § 501(c)(6) organization for

purposes of communicating its political views, but its member businesses are not, and the Association asserts associational standing on their behalf. S.A. 35, 37. Some Association members' owners, motivated by "deep religious convictions," hold meetings—sometimes mandatory—in which they communicate their religious views to employees. S.A. 37. Other members wish to convey to employees, including in mandatory meetings, their views that unionization would be contrary to the interests of the business and its employees. S.A. 37. Many members also discuss political matters, as defined by the Act, in mandatory employee communications because such issues directly affect their operations and workforce. S.A. 37–38.

The Act, the accompanying threat of enforcement, and the risk of penalties and fines have chilled the speech of the Institute and the Association's members, who, but for the Act, would continue to engage in speech the Act prohibits. S.A. 35–38.

## C.    Procedural History

The Institute filed its complaint on August 8, 2024, challenging the Act on its face as a violation of the First Amendment and seeking declaratory relief and preliminary and permanent injunctions barring the Director of the Illinois Department of Labor, in her official capacity, from implementing and enforcing the Act. S.A. 2, 32, 38–41. On October 30, 2024, the Institute amended its complaint to add the Association as a plaintiff. S.A. 30–42. Simultaneously with its amended complaint, Plaintiffs moved for a preliminary injunction to prevent the Director from enforcing the Act upon its effective date. S.A. 2.

Defendant filed a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) for lack of subject-matter jurisdiction, invoking Eleventh Amendment

sovereign immunity and, alternatively, lack of Article III standing. S.A. 2. On September 30, 2025, the district court dismissed the case without prejudice on sovereign-immunity grounds and terminated the preliminary-injunction motion as moot. S.A. 2, 25.

The district court held that Plaintiffs' suit was barred by the Eleventh Amendment because they had not satisfied the *Ex parte Young* exception. S.A. 8–25. The court concluded that Plaintiffs failed to show (1) that the Director possesses enforcement authority under the Act that a federal injunction could meaningfully restrain, or (2) that she was threatening or about to commence enforcement proceedings against them. S.A. 19, 25. First, the district court held that the Director's role under the Act is merely "ministerial or administrative." S.A. 12–19. Although the Act states that "[t]he Department shall inquire into any alleged violations" and "institute the actions for the penalties provided in this Section and . . . enforce the provisions of this Act," the court read this language "in context" to confer no independent cause of action or substantive enforcement power on the Director. S.A. 12–13. The court reasoned that only private "interested parties" can file complaints and civil actions, and those private actions may proceed regardless of the Director's conduct. S.A. 12–13. The court treated references to "jurisdiction" and "administrative enforcement" in Section 25(b)(4)(C) as surplusage imported from another statute with a different enforcement scheme. S.A. 15–16. It therefore held that the Director lacked the requisite connection to enforcement of the Act, and

that enjoining her could not redress Plaintiffs' alleged injuries from private employee and interested-party suits. S.A. 12–13, 17–18.

Second, the district court held that Plaintiffs had not shown an "ongoing violation of federal law" because they failed to establish a credible threat that the Director would enforce the Act against them. S.A. 18–24. The court credited the Director's sworn disavowal of any intent or perceived authority to enforce the Act, noted the absence of any complaints or threatened proceedings against Plaintiffs, and found no evidence that the Act had yet affected Plaintiffs' day-to-day operations. S.A. 19–24.

Having concluded that sovereign immunity barred the suit against the Director, the district court dismissed Plaintiffs' complaint without prejudice and expressly declined to address the Director's alternative Article III arguments. S.A. 25.

## Summary of Argument

The district court erred in dismissing this case on sovereign immunity grounds. Under *Ex parte Young*, 209 U.S. 123 (1908), the Director is a proper defendant because she has a direct statutory connection to the enforcement of the Worker Freedom of Speech Act and is presently administering an ongoing enforcement regime that chills Plaintiffs' protected speech.

First, the Act's plain text grants the Director clear enforcement authority. It provides that the Department "*shall* inquire into any alleged violations," "institute the actions for the penalties," and "enforce the provisions of this Act." 820 ILCS 57/25(a) (emphasis added). It further empowers the Director to demand that

employers "cure" violations, "exercise jurisdiction" over complaints, and conduct "administrative enforcement" before issuing right-to-sue letters. 820 ILCS 57/25(b). These are classic executive enforcement functions, not ministerial tasks. The district court's interpretation improperly rendered these active statutory commands surplusage and ignored the Act's structure, which channels civil penalties to the Department and charges the Director with the "administrative enforcement" of the Act and the "jurisdiction" to inquire into violations—roles analogous to the enforcement roles in Title VII and other right-to-sue statutes.

Second, the district court misapplied the "ongoing violation" requirement. The *Ex parte Young* inquiry asks whether the official is presently implementing a legal regime that allegedly conflicts with federal law and whether the relief sought is prospective. *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002). The Director remains the official charged with receiving complaints, demanding cures, and collecting civil penalties payable to the Department. This standing enforcement apparatus constitutes an ongoing violation regardless of whether the Director has issued a personalized threat to these Plaintiffs or commenced an imminent prosecution. The district court erred by importing an individualized "imminent prosecution" requirement into the sovereign-immunity inquiry and by treating the Director's self-serving declaration of non-enforcement as dispositive.

The Court should reverse and remand for a decision on the merits.

## Argument

The district court dismissed Plaintiffs' complaint under Fed. R. Civ. P. 12(b)(1),

holding that it lacked subject-matter jurisdiction because the Director is entitled to

sovereign immunity. In the court's view, she lacks enforcement authority under the

Act and is not "about to commence" enforcement against Plaintiffs. S.A. 8–25. Both

conclusions are wrong.

This Court reviews de novo an order of dismissal for lack of subject matter

jurisdiction based on Eleventh Amendment sovereign immunity. *Sherwood v.

Marchiori*, 76 F.4th 688, 693 (7th Cir. 2023). In evaluating a Rule 12(b)(1) motion, a

court must first determine whether the motion raises a factual or facial challenge to

jurisdiction. *Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015). Here, Defendant

raised a factual challenge. S.A. 3. A factual challenge contends that "there is in fact

no subject matter jurisdiction," even if the pleadings are formally sufficient, and

permits the court to look beyond the pleadings to any evidence bearing on

jurisdiction. *Silha*, 807 F.3d at 173.

Although Eleventh Amendment sovereign immunity generally bars federal-court

actions against states, state agencies, and state officials acting in their official

capacity, "sovereign immunity is not absolute immunity." *Council 31 of the Am.

Fed'n of State, Cnty. & Mun. Emps. v. Quinn*, 680 F.3d 875, 882 (7th Cir. 2012). A

well-established exception to sovereign immunity exists, "grounded in traditional

equity practice[,] that allows certain private parties to seek judicial orders in federal

court preventing state executive officials from enforcing state laws that are contrary

to federal law." *Whole Woman's Health v. Jackson*, 595 U.S. 30, 39 (2021) (citing *Ex*

*parte Young*, 209 U.S. at 159–60 (1908)). Under *Ex parte Young*, private parties may sue individual state officials for prospective relief to enjoin ongoing violations of federal law. *Council 31*, 680 F.3d at 882.

To determine whether the *Ex parte Young* doctrine applies, a court "need only conduct a 'straightforward inquiry' into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002). A plaintiff satisfies the requirements of *Ex parte Young* where the defendant is a "state official who has 'some connection with the enforcement' of an allegedly unconstitutional state statute," and "where the injury is causally connected to that enforcement and that enjoining the enforcement is likely to redress [plaintiff's] injury." *Doe v. Holcomb*, 883 F.3d 971, 975–76 (7th Cir. 2018) (quoting *Ex parte Young*, 209 U.S. at 157).

Plaintiffs satisfy this standard.

## I.  The *Ex parte Young* exception to sovereign immunity applies to Plaintiffs' claims against the Director.

The Director is not entitled to sovereign immunity. She has a direct enforcement connection to the Act, and she is presently administering an ongoing enforcement regime that conflicts with the First Amendment.

### A.  The Director has a sufficient enforcement connection to the Act under *Ex parte Young*.

The district court first held that the *Ex parte Young* doctrine did not apply because the Director lacked "some role in enforcing the statute." S.A. 9 (quoting *Doe v. Holcomb,* 883 F.3d 971, 975 (7th Cir. 2018)). That conclusion is belied by the Act's

plain text, which grants the Department (and the Director) concrete enforcement authority.

### 1. The Act's text grants the Director concrete enforcement authority.

Section 25 of the Act—titled "Powers of the Department and civil penalties"—provides that "[t]he Department shall inquire into any alleged violations of this Act, brought to its attention by an interested party, *to institute the actions for the penalties provided in this Section and to enforce the provisions of this Act.*" 820 ILCS 57/25(a) (emphasis added). Section 25 further provides that, in addition to the relief an aggrieved employee may be entitled to under Section 20, "an employer shall be assessed a civil penalty of $1,000 for each violation of Section 15, payable to the Department." 820 ILCS 57/25(a). The Act also empowers the Department to require an employer "cure" any violation. 820 ILCS 57/25(b)(2), (b)(3), (c). And the Director may issue a "notice of right to sue" only after she has, among other things, determined that an allegation is "justified" or has made no determination and "either has decided not to *exercise jurisdiction* over the matter or has concluded *administrative enforcement* of the matter." 820 ILCS 57/25(b)(4)(C) (emphasis added).

Although the district court acknowledged this language and that "enforcement" does not refer only to prosecutorial means of enforcement, it nevertheless concluded the Act confers "no cause of action on the Director" and reduces her to a "ministerial or administrative" actor. S.A. 11, 12, 19. That reading understates—and effectively ignores—the Director's enforcement powers under the Act.

It is true that the Director's enforcement powers are triggered only when a violation is "brought to its attention by an interested party." 820 ILCS 57/25(a). But that language only specifies *when* the Department's duties arise, not *what* those duties are. Once triggered, the Act commands the Department (acting through the Director) to "inquire," "institute the actions for the penalties," and "enforce the provisions of this Act." 820 ILCS 57/25(a). As the district court recognized, an official need not be the primary authority responsible for enforcing a challenged law to have a sufficient enforcement connection to be a proper *Ex parte Young* defendant. S.A. 11–12 (citing 281 *Care Comm. v. Arneson*, 638 F.3d 621, 632 (8th Cir. 2011); *see also Reprod. Health Servs. of Planned Parenthood of the St. Louis Region, Inc. v. Nixon*, 428 F.3d 1139, 1145–46 (8th Cir. 2005) (finding *Ex parte Young* exception applied where the attorney general had no authority to initiate criminal prosecution, but could only participate in a criminal proceeding if his assistance was requested by the assigned county attorney or the trial court asked him to sign indictments)). The fact that the Director's powers arise when an "interested party" brings a complaint to the Department does not bar Plaintiffs' suit.

Nevertheless, the district court treated the interested party trigger as if it eliminated the distinct enforcement language that follows. S.A. 12–13. It held that "in context" the Director's power "to institute the actions for the penalties provided in this Section and to enforce the provisions of this Act," 820 ILCS 57/25(a), did not

amount to "some role in enforcing the statute," *Ex parte Young*, 209 U.S. at 157, for purposes of the *Ex parte Young* doctrine. S.A. 12.

The phrases "institute the actions for the penalties" and "enforce the provisions of this Act" are active powers conferred upon the Director. The district court read these phrases as empty because Section 25(c) allows interested parties to "initiate a civil action for penalties" and because Section 25(d) refers generically to "any claim or action filed under this Section." S.A. 12. But nothing in Section 25 forecloses the Director from bringing or conducting "actions for the penalties provided in this Section" on the State's behalf once an interested party complaint has been filed. The district court's interpretation effectively rewrites "institute the actions for the penalties" and "enforce the provisions of this Act" to mean "watch others institute the actions for the penalties" and "watch others enforce the provisions of this Act."

The better reading—consistent with the text and structure—is that Section 25 creates complementary enforcement roles within the same track. The interested party initiates the matter by bringing it to the Department's attention and may file a civil action. The Department, once presented with a matter by an interested party, must "inquire," may "exercise jurisdiction," may undertake "administrative enforcement of the matter," and is charged with instituting "actions for the penalties" payable to the Department. 820 ILCS 57/25(a), (b)(4)(C). Nothing in Illinois law requires that a statute use the specific words "may bring a civil action" to confer enforcement authority, especially where—as here—other provisions

unmistakably assume such authority. *See Chapman v. Chi. Dep't of Fin.*, 2023 IL 128300, ¶ 28 (courts give statutory text its "plain and ordinary meaning").

## 2. The Act fits the familiar "right-to-sue" model where the gatekeeping agency also enforces the law.

Further supporting the conclusion that the Department has enforcement power, the Act provides that the Director "issues a notice of right to sue" only after she has, among other things, determined that an allegation is "justified" or has made no determination and "either has decided not to exercise jurisdiction over the matter or has concluded administrative enforcement of the matter." 820 ILCS 57/25(b)(4)(C). The phrases to "exercise jurisdiction" and to "conclude[] administrative enforcement" presuppose that the Director may accept or decline jurisdiction and may undertake "administrative enforcement of the matter" before issuing a right to sue letter.

The district court treated these phrases as inexplicable surplusage "imported verbatim from another statute" and effectively wrote them out of the Act. S.A. 16. But courts must assume that the ordinary meaning of the language of a statutory text accurately expresses the legislative purpose. *Mueller v. City of Joliet*, 943 F.3d 834, 836 (7th Cir. 2019). And Illinois law requires that "[e]ach word, clause, and sentence of a statute must be given a reasonable meaning, if possible, and should not be rendered superfluous." *Chi. Teachers Union, Local No. 1 v. Bd. of Educ.*, 2012 IL 112566, ¶ 15. It is possible—indeed straightforward—to give meaning to "jurisdiction" and "administrative enforcement": they describe the Director's enforcement functions, triggered by an interested party complaint and exercised

before any private suit proceeds. Even if the phrases "exercise jurisdiction" and "conclude[] administrative enforcement" were borrowed from the Day and Temporary Labor Services Act—as the Director asserts, S.A. 14—the same terms in that statute clearly denote enforcement powers. When the General Assembly repeats identical enforcement language and structure in a related provision, the natural inference is that it intends that framework to operate with the same force there as well, not as a hollow ritual. *People v. Gutman*, 2011 IL 110338, ¶ 12 (In construing a statute, a court must view the statute "as a whole, construing words and phrases in light of other relevant statutory provisions and not in isolation.").

If the General Assembly had intended the Director to serve merely as a "court clerk" with no enforcement role, it chose an extraordinary way to say so. In every comparable "file with agency, then receive a right-to-sue letter" regime—both in Illinois and under federal law—the gatekeeping agency also possesses independent enforcement authority.

The most familiar "right-to-sue" framework is Title VII of the Civil Rights Act of 1964. Before filing suit in federal court, a claimant must: (1) file a charge with the EEOC (or a state fair-employment agency); (2) allow the EEOC to investigate and attempt conciliation; and (3) receive a "Notice of Right to Sue" before proceeding to court. 42 U.S.C. § 2000e-5(f)(1). The EEOC has authority to:

- Investigate charges, issue subpoenas, and compel testimony, 42 U.S.C. § 2000e-8, -9;

- Pursue conciliation and settlement, 42 U.S.C. § 2000e-5(b);

- Bring its own enforcement actions in federal court in the name of the United States, 42 U.S.C. § 2000e-5(f)(1); and

- Seek full remedial relief, including back pay, reinstatement, and injunctive orders, 42 U.S.C. § 2000e-5(g)(1).

The same structure applies under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 626, and the Americans with Disabilities Act (ADA), 42 U.S.C. § 12117(a). In each, the agency that issues the right-to-sue notice is also empowered to enforce the underlying statute through its own litigation.

Illinois law follows the same model. Under the Illinois Human Rights Act, 775 ILCS 5/1-101 *et seq.*, a complainant must:

- File a charge with the Illinois Department of Human Rights (IDHR);

- Allow IDHR to investigate and determine whether "substantial evidence" of discrimination exists; and

- Depending on IDHR's findings, either proceed to a hearing before the Illinois Human Rights Commission or receive authorization to file in circuit court.

775 ILCS 5/7A-102. Like the EEOC, IDHR is far more than a mailbox. It:

- Conducts investigations, 775 ILCS 5/7A-102(A);

- Issues findings of "substantial evidence" or "lack of substantial evidence," 775 ILCS 5/7A-102(D);

- Prosecutes cases before the Human Rights Commission when it finds substantial evidence, 775 ILCS 5/8-111(B); and

- Seeks remedies including back pay, emotional distress damages, and cease-and-desist orders, which the Commission can award and circuit courts can enforce, 775 ILCS 5/8A-104.

Illinois has enacted several other employment-protection statutes that require employees or advocacy groups to file complaints with the Department of Labor, allow the Department to investigate and attempt resolution, and authorize private lawsuits if the Department does not resolve the matter within a set time. In each, the Department has enforcement authority in addition to its gatekeeping role.

For example, the Victims' Economic Security and Safety Act, 820 ILCS 180/1 *et seq.*, protects employees who are victims of domestic violence, sexual violence, or other crimes of violence. Employees may file complaints with the Department of Labor, which: "[h]as the power to conduct investigations in connection with the administration and enforcement of this Act," 820 ILCS 180/30(a); and may issue subpoenas and bring enforcement actions in circuit court, 820 ILCS 180/30(b), (c). Employees may also bring their own civil actions. 820 ILCS 180/20.

Likewise, the Personnel Records Review Act, 820 ILCS 40/2, gives employees the right to inspect and copy their personnel files. If an employer refuses, the employee may file a complaint with the Department of Labor. The Department has the power to investigate and attempt to resolve complaints "by conference, conciliation, or persuasion"; has authority to "investigate, request the issuance of a search warrant, or issue a subpoena to inspect the files of the employer"; and may bring enforcement actions in circuit court. 820 ILCS 40/12(b). If the Department does not resolve the

complaint within 180 days (or certifies it is unlikely to do so), the employee may file suit. 820 ILCS 40/12(c).

Plaintiffs are aware of no Illinois employment statute in which an agency must receive complaints and issue right-to-sue letters but has no investigation, conciliation, or enforcement authority of any kind. The Act fits squarely within this mainstream model where the gatekeeping agency also has independent enforcement authority. The district court's reading of the Act makes it an unprecedented exception: an agency commanded to sit in the middle of the enforcement process, with a financial stake in penalties, yet stripped of all enforcement tools. That interpretation defies the statutory text and has no analogue in Illinois or federal law.

In short, once an interested party brings a violation to the Department's attention, the Director's role is enforcement, not mere docketing. Enjoining her from "exercis[ing] jurisdiction," undertaking "administrative enforcement," and "institut[ing] the actions for the penalties" would unquestionably restrain the State's enforcement of the Act. That is exactly the "connection" *Ex parte Young* requires. *See Holcomb*, 883 F.3d at 975–76.

### 3. The Act's penalty structure confirms the Director is an enforcement official, not a neutral clerk.

The Act provides that an employer is subject to "a civil penalty of $1,000 for each violation *payable to the Department*," with "10% of any statutory penalties" and attorney's fees awarded to the interested party plaintiff. 820 ILCS 57/25(a), (e)

(emphasis added). Thus, every action under Section 25 is prosecuted on behalf of the State, and 90% of the penalty flows to the Department.

When a statute (1) channels financial penalties to a state agency, (2) charges that agency with "inquir[ing] into" alleged violations, and (3) authorizes it to "exercise jurisdiction," conduct "administrative enforcement," and "institute the actions for the penalties," that agency is not a neutral clerk. It is the State's enforcement arm for that statutory scheme. The district court's contrary conclusion ignored the statute's economic and structural design.

### 4. *Whole Woman's Health* supports, rather than undermines, treating the Director as an enforcement official.

The district court relied on *Whole Woman's Health v. Jackson*, 595 U.S. 30 (2021), but misapplied it. S.A. 16–18. The Texas Heartbeat Act at issue there prohibited physicians from performing an abortion (a protected constitutional right at the time) except in a medical emergency. *Whole Woman's Health*, 595 U.S. at 35. The law did not grant state officials the power to bring criminal or civil enforcement actions but instead provided for enforcement through private civil actions. *Id.*

The Court held that judges and clerks were not proper *Ex parte Young* defendants because they neutrally adjudicated and docketed private disputes, while certain executive licensing officials—the executive director of the Texas Medical Board, the executive director of the Texas Board of Nursing, the executive director of the Texas Board of Pharmacy, and the executive commissioner of the Texas Health and Human Services Commission—were proper defendants because state law gave them enforcement duties with respect to abortion regulations. *Id.* at 39–

40, 45–47. Those "executive licensing official[s] may or must take enforcement actions" against medical professionals, successfully sued by private persons under the Heartbeat Act, for violating the requirements of their medical licenses under Texas law. *Id.* at 45. There, as here, state officials would take action only after a private party took some action to prompt enforcement of the law.

The Director here is like the licensing officials, not the clerks and judges. The Court in *Whole Woman's Health* found that Texas law imposed on licensing officials "a duty to enforce a law that 'regulate[s] or prohibit[s] abortion,' a duty expressly preserved by [the Heartbeat Act's] saving clause." *Id.* at 47. Illinois law imposes an analogous duty on the Director to "inquire into alleged violations" of the Act, "institute the actions for the penalties," "exercise jurisdiction" over complaints, and "enforce the provisions of this Act." 820 ILCS 57/25(a), (b)(4)(C). Indeed, the Director's enforcement connection is more direct and explicit: the Act expressly grants her enforcement power and channels civil penalties "payable to the Department." 820 ILCS 57/25(a).

The district court nonetheless found that the Director "is more akin to the immune court clerks in *Whole Woman's Health*, as she serves only 'to file cases as they arrive.'" S.A. 11–12. But as *Whole Woman's Health* emphasized, the *Ex parte Young* exception does not normally permit federal courts to issue injunctions against state court judges and clerks precisely because, as judicial officers, they do not enforce state laws as executive officials do. 595 U.S. at 39. The Director is an *executive* official, not a judicial one. And the Act gives her far more than the power

22

to file cases: she may demand an employer cure a violation, collect civil penalties, "exercise jurisdiction," and undertake "administrative enforcement." 820 ILCS 57/25. The Director thus cannot be analogized to a clerk who simply "file[s] cases as they arrive." S.A. 17–18 (quoting *Whole Woman's Health*, 595 U.S. at 40). Her statutory role—investigating, exercising jurisdiction, enforcing, and receiving penalties—fits comfortably within *Ex parte Young's* core.

Nor does *Whole Woman's Health* support the district court's conclusion that *Ex parte Young* is unavailable because "enjoining the Director from demanding that employers cure alleged violations would not stop interested parties from being able to file civil suits." S.A. 13 (citing *Whole Woman's Health*, 595 U.S. at 44). *Ex parte Young* does not require that an injunction against a state official eliminate every conceivable form of enforcement. It is enough that the official "plays some role in enforcing the state law," *Holcomb*, 883 F.3d at 975–76, and that enjoining that role will meaningfully restrain the State's enforcement of the challenged statute. *See Verizon*, 535 U.S. at 645. In *Whole Woman's Health*, the Court recognized that *Ex parte Young* applies so long as some state official "may or must take enforcement actions" under the challenged law, even where the statute "relies on the enforcement efforts of private parties" as its primary mechanism. 595 U.S. at 45–47. The fact that private suits would proceed regardless did not defeat *Ex parte Young* jurisdiction against the licensing officials.

Here, enjoining the Director from receiving and processing Section 25 complaints, "exercis[ing] jurisdiction" and undertaking "administrative

enforcement," and "institut[ing] the actions for the penalties" payable "to the Department," 820 ILCS 57/25(a), (b)(4)(C), would dismantle the State-administered enforcement mechanism that most directly chills Plaintiffs' speech—even if individual employees can still bring their own suits. The district court erred in finding that the Director has no connection to the enforcement of the Act.

This Court should reverse and remand.

## B. *Ex parte Young* requires an ongoing enforcement regime and prospective relief, not a personal threat to Plaintiffs.

The district court also held that even if the Director had some enforcement authority under the Act, sovereign immunity would still bar this suit because Plaintiffs failed to prove that she is "about to commence" enforcement proceedings against them. S.A. 10, 19–24 (quoting *Ex parte Young*, 209 U.S. at 156). In doing so, the court divorced *Ex parte Young's* "ongoing violation" requirement from modern pre-enforcement case law, misread *Whole Woman's Health* as demanding proof of an imminent, individualized enforcement action, and improperly treated the Director's litigation-driven declaration as dispositive.

### 1. The ongoing violation required by *Ex parte Young* here is the Director's administration of the Act's enforcement regime.

The "ongoing violation of federal law" inquiry under *Ex parte Young* is "straightforward": a federal court asks, "whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon*, 535 U.S. at 645. The focus of this inquiry is on (1) whether a state official is presently implementing or maintaining a legal regime that allegedly conflicts with federal law, and (2) whether the requested relief is forward-looking. Nothing in

*Verizon's* "straightforward inquiry" suggests that a plaintiff must show an imminent, individualized enforcement action over and above the official's current administration of the challenged scheme. *See id.*

What must be "ongoing" is the state's enforcement regime—the continuing operation of an allegedly unconstitutional law or policy by a state official—not a particular defendant's expressed intention to prosecute these plaintiffs. *See Green v. Mansour*, 474 U.S. 64, 68 (1985) (exception applies where suit "challeng[es] the constitutionality of a state official's action in enforcing state law"). Where a plaintiff challenges a statute or regulatory scheme that is currently in force and being implemented, the violation is "ongoing" so long as the official continues to apply that law in a way that allegedly conflicts with federal law. *Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 255 (2011) (describing *Ex parte Young* as permitting suits where a state official has "violated federal law in carrying out his official responsibilities"); *Verizon*, 535 U.S. at 645 (focusing on "ongoing violation of federal law" and prospective relief).

This Court has explained that under the doctrine of *Ex parte Young*, suits against state officials "must seek relief against an 'ongoing' violation of federal law"; i.e., one that is "continuing." *Driftless Area Land Conservancy v. Valcq*, 16 F.4th 508, 522 (7th Cir. 2021). In a pre-enforcement challenge like this one, the "ongoing violation" is the official's current role in enforcing or administering a statute that allegedly conflicts with federal law, coupled with a request to enjoin or declare unlawful that enforcement. The doctrine does not impose an additional requirement

that the official have issued a personalized "threat" to the plaintiff on top of her statutory enforcement responsibilities.

That is the situation here. Plaintiffs challenge a speech-regulating statute that is presently in force. Under the Act, the Director is the state official expressly charged with receiving complaints from interested parties, inquiring into alleged violations, instituting actions for penalties, and enforcing the provisions of this Act. 820 ILCS 57/25(a). She must serve notice of complaints on employers, attempt resolution or "cure," and may "exercise jurisdiction" and conduct "administrative enforcement of the matter" before issuing a "notice of right to sue." 820 ILCS 57/25(a), (b). She is also responsible for collecting civil penalties that are paid to the Department under the Act. 820 ILCS 57/25(a). That is not a one-time, historical event; it is a standing enforcement apparatus the Director continues to administer so long as she occupies the office.

The Director's declaration cannot nullify the Act's enforcement machinery. She asserts that she "does not understand the Act, or any other part of the Illinois Compiled Statutes, to grant her power to enforce the Act beyond informing a defendant when a complaint has been filed against it and sending the 'notice of right to sue' after 180 days," S.A. 6, and that she "does not intend to do anything else with respect to the Act." S.A. 20. By her own account, she will, however, continue to receive complaints, notify employers, and issue right-to-sue letters. And she has not—and cannot—repudiate the Department's role in administering the Act's penalty scheme. The Act commands that the Department "shall . . . inquire

into any alleged violations," "institute the actions for the penalties," and "enforce the provisions of this Act." 820 ILCS 57/25(a). The Director's declaration cannot override the Act's plain text that the Department "shall" enforce its provisions.

So long as the Director stands ready, in her official capacity, to operate this complaint, investigation, cure, right-to-sue, and penalty-collection machinery under 820 ILCS 57/25, there is an ongoing violation of federal law. It is that continuing enforcement relationship—not the presence or absence of an individualized threat— that satisfies *Ex parte Young's* "ongoing violation of federal law" requirement.

### 2. The district court improperly converted *Ex parte Young's* "ongoing violation" requirement into a "threatening" test.

The district court nevertheless held that *Ex parte Young* was unavailable because Plaintiffs had not shown that the Director was "about to commence proceedings" against them—i.e., that she is personally "threatening [the plaintiff] with an enforcement action"—given her declaration disavowing any current intent to enforce the Act against them. S.A. 9–10, 19–21. In so doing, the court effectively converted *Ex parte Young's* "ongoing violation" requirement into a "threatening the plaintiff" requirement. That was error.

The "threatening" language in *Ex parte Young* on which the district court relied describes how a plaintiff shows that a particular official is a proper defendant—i.e., that the official has a sufficient enforcement connection to the challenged law. It does not graft an "imminent prosecution" element onto the sovereign-immunity inquiry itself. That is why modern cases distill the test to whether the official is "responsible for" or "plays some role in enforcing" the challenged law. *See Holcomb*,

883 F.3d at 975–76; *Driftless*, 16 F.4th at 515, 521–22; *Verizon*, 535 U.S. at 645. None of these decisions requires plaintiffs to prove that the defendant has "threatened" them, as opposed to maintaining the enforcement regime that inflicts the ongoing constitutional harm.

*Sherman v. Community Consolidated School District 21 of Wheeling Township*, 980 F.2d 437 (7th Cir. 1992), illustrates the point and is readily distinguishable from this case. There the plaintiffs challenged a state statute authorizing voluntary classroom recitation of the Pledge of Allegiance and sued, among others, the Illinois Attorney General. 980 F.2d at 439–41. This Court dismissed the Attorney General because he had "no authority to enforce" the statute at issue and had "never threatened the [plaintiffs] with prosecution." *Id*. at 441. This Court's reference to "threatened" prosecution—on which the district court relied for its incorrect test— was shorthand for the Attorney General's lack of enforcement power: he neither enforced the daily recitation at the school nor possessed prosecutorial authority to compel it. The ongoing constitutional violation, this Court emphasized, was "being enforced at Richard's school by daily recitation of the pledge"—i.e., by local actors who did have enforcement authority. *Id*. at 441–42.

In other words, *Sherman* turned on who had authority to enforce the challenged policy, not on any freestanding requirement that a proper *Ex parte Young* defendant must issue individualized threats. Where, as in *Sherman*, a state official has no role in administering the law, there is no ongoing violation attributable to that official, and sovereign immunity applies. Where, as here, an official is expressly charged by

statute with "inquir[ing] into any alleged violations," "institut[ing] the actions for the penalties," "enforc[ing] the provisions of this Act," exercising "jurisdiction," conducting "administrative enforcement," and receiving civil penalties payable "to the Department," 820 ILCS 57/25(a), (b)(4)(C), there is an ongoing violation for *Ex parte Young* purposes even if the official has not personally promised to sue these Plaintiffs. *Cf. Majors v. Abell*, 317 F.3d 719, 721 (7th Cir. 2003) ("A plaintiff who mounts a pre-enforcement challenge to a statute that he claims violates his freedom of speech need not show that the authorities threatened to prosecute him, the threat is latent in the existence of the statute." (internal citations omitted)).

Requiring, in addition, an express threat directed at this particular plaintiff would convert *Ex parte Young's* "straightforward" inquiry into something much narrower than the Supreme Court has described. Applied here, that rule would allow a state official to continue operating a constitutionally suspect enforcement scheme while evading *Ex parte Young* simply by declining to issue explicit threats or by submitting a post-suit declaration disavowing imminent enforcement. And it would make pre-enforcement First Amendment challenges to a statute with a private-complaint mechanism practically impossible. How are Plaintiffs supposed to know when a complaint may be brought against them by any "interested party"? That is not what *Verizon* means by a "straightforward" inquiry into an "ongoing violation of federal law," and it is not how this Court has described the doctrine in cases like *Driftless*.

### 3. Article III's "credible threat" standard does not require an individualized enforcement threat from a defendant state official.

The fact that Article III requires a credible threat that someone will enforce the challenged law does not mean that *Ex parte Young* requires an individualized "threat" by the particular state official named as defendant. *Ex parte Young* asks whether that official is a proper target for injunctive relief—i.e., whether she plays a nontrivial role in maintaining the enforcement regime alleged to violate federal law. Article III asks whether the plaintiff faces a sufficiently concrete risk of injury from the overall enforcement scheme. The doctrines are analytically distinct, but in a pre-enforcement First Amendment case like this one, courts look to the same basic features of the state's enforcement scheme to determine both whether there is a concrete, credible threat of enforcement for Article III purposes and whether a particular state official is a proper target for prospective relief under *Ex parte Young*. *See Verizon*, 535 U.S. at 643–46 (treating the *Ex parte Young* inquiry as distinct from Article III but focusing on state officials' ongoing administration of a regulatory order to satisfy both); *cf. Whole Woman's Health*, 595 U.S. at 42–44 (separately analyzing sovereign immunity and justiciability while looking to which officials have "authority to enforce" to decide who can be sued and whether a live controversy exists).

The Supreme Court's pre-enforcement First Amendment decisions hold that a plaintiff "need not first expose himself to actual arrest or prosecution" to challenge a law restricting his speech. *Steffel v. Thompson*, 415 U.S. 452, 459 (1974). It suffices that the law "on its face proscribes" his intended conduct and there is a "credible

threat" of enforcement. *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298, 302 (1979); *see also Va. v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 392–93 (1988). The Court reaffirmed that framework in *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158–65 (2014), and *303 Creative LLC v. Elenis*, 600 U.S. 570, 583 (2023), and this Court has applied it repeatedly in First Amendment pre-enforcement suits. *See, e.g., ACLU of Ill. v. Alvarez*, 679 F.3d 583, 590–94 (7th Cir. 2012); *Ezell v. City of Chicago*, 651 F.3d 684, 695–99 (7th Cir. 2011); *Brown v. Kemp*, 86 F.4th 745, 768–69 (7th Cir. 2023).

The Supreme Court and this Court have rejected the notion that plaintiffs must point to a specific, imminent prosecution or an express threat directed at them. Instead, the question is whether the combination of the statute's text, the plaintiff's intended course of conduct, the structure of the enforcement regime, and any history of enforcement creates an objectively reasonable, non-speculative risk of being subjected to the law if the plaintiff speaks. *See, e.g., Driehaus*, 573 U.S. at 161, 164 (standing existed where plaintiffs "inten[ded] to engage in" speech "arguably proscribed by the [statute]," there was a past enforcement history, and "authority to file a complaint . . . is not limited to a prosecutor or an agency"); *303 Creative*, 600 U.S. at 583 (a credible threat existed where "anyone in the State may file a complaint" and thereby initiate "a potentially burdensome administrative hearing"); *Kemp*, 86 F.4th at 768–69 (a credible threat existed where "significant risk that [the] hunter-harassment law will be enforced" in the future, and that

"government authorities are not the only ones who may seek to enforce" the law; private actors also could).

The district court discounted this authority on the ground that most of these cases addressed Article III standing, not sovereign immunity. S.A. 21–23. But *Ex parte Young* and Article III stand or fall together on this point: both require a concrete, prospective dispute suitable for adjudication, which is precisely what a credible threat of enforcement supplies. *See MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128–29 (2007) (rejecting any requirement that a plaintiff "bet the farm" before seeking prospective relief). Nothing in *Ex parte Young* allows a state official with concededly relevant enforcement authority simply to nullify that credible threat by filing an affidavit disclaiming present enforcement plans.

Here, Plaintiffs allege a concrete intention to continue holding mandatory meetings and communications in which they speak to employees about "political" and "religious" "matters" as defined by the Act. S.A. 35–38. The Act makes such mandatory communications unlawful and creates an elaborate enforcement regime that invites both employees and "interested parties" to trigger sanctions and penalties, with the Department as the central clearinghouse that "inquire[s] into alleged violations," issues right-to-sue letters, and receives civil penalties. 820 ILCS 57/20, 57/25(a)–(c), (e).

That structure itself—combined with Plaintiffs' concrete plans to engage in covered speech—is more than enough to create a "credible threat" of enforcement in the Article III sense. The credible-threat inquiry accounts for the risk of

enforcement by any actor authorized to wield the statute—employees, interested-party organizations, and the Department—not just the subjective assurances of one official that she personally does not "intend" to enforce the law. *See Driehaus*, 573 U.S. at 164; *Kemp*, 86 F.4th at 768–69.

The district court effectively treated the Director's declaration as dispositive of the credible-threat inquiry, reasoning that "the sole evidence before the Court as to a threat of enforcement is the Director's affidavit" stating she does not intend to enforce the Act against Plaintiffs. S.A. 23. But that gives dispositive weight to the Director's personal interpretation of state law. *Whole Woman's Health* instructs that "state courts and not this one are the final arbiters of the meaning of state statutory directions." 595 U.S. at 47. And this Court has cautioned that an Attorney General's or state officer's interpretation of her own powers is not binding because she "may change [her] mind, and [she] may be replaced in office." *Kucharek v. Hanaway*, 902 F.2d 513, 519 (7th Cir. 1990). The district court acknowledged *Kucharek* but then relied on the Director's views to strip operative meaning from the Act. S.A. 16.

The Director's declaration cannot erase the objective reality that the Act—by its terms—assigns enforcement duties to her office and exposes Plaintiffs to penalty actions facilitated and administered by that office. *See Rodgers v. Bryant*, 942 F.3d 451, 455 (8th Cir. 2019) (post-hoc assurances by a single official "do not rule out the possibility that [she] will change [her] mind and enforce the law more aggressively in the future."). And the Director's assurances say nothing about the enforcement intentions of other actors—employees, interested parties, or future Directors—who

also hold enforcement power. *See Driehaus*, 573 U.S. at 164; *Kemp*, 86 F.4th at 768–69. Allowing an executive official to defeat *Ex parte Young* simply by promising, for now, not to enforce a facially applicable speech restriction would create an easy blueprint for immunizing unconstitutional statutes from federal review. That is not, and cannot be, the law.

Here, the Director does not purport to bind employees or "interested parties," and she cannot bind her successors. The statute remains on the books, squarely targets Plaintiffs' intended speech, and provides ample incentives (including statutory penalties payable to the Department and a 10% bounty for interested parties, 820 ILCS 57/25(a), (e)) for third-party enforcement. Indeed, any "interested party"—defined broadly as an organization "attentive to compliance" with "other statutory requirements" 820 ILCS 57/10—can trigger the Director's enforcement machinery. The "interested party" a category is broad enough to encompass ideological opponents of Plaintiffs' speech—a concern particularly for an organization like the Institute that frequently takes positions on contested issues of government policy. That is enough to create a present injury-in-fact in the form of chilled speech and a credible threat of enforcement—even if the current Director professes reluctance to use every tool the statute gives her.

The district court also erred in treating the absence of past enforcement of the Act against employers similarly positioned to Plaintiffs as dispositive. The Supreme Court has never required a prior prosecution or a pending charge to sustain a pre-enforcement First Amendment challenge. *See Babbitt*, 442 U.S. at 302; *Am.*

*Booksellers Ass'n, Inc.*, 484 U.S. at 392–93. Indeed, it is not surprising that there was no history of enforcing the Act: at the time Plaintiffs filed their amended complaint and motion for preliminary injunction, the Act had not yet gone into effect. It has only been in effect since January 1, 2025—just over one year.[2] Plaintiffs are not required to wait for the Act to go into effect and for a complaint to be filed against them before seeking relief.

The district court treated the Director's self-serving declaration as "the sole evidence" on the threat-of-enforcement question and faulted Plaintiffs for not producing contrary affidavits showing that the Director will enforce the Act against them. S.A. 22–24. But Plaintiffs did submit "competent proof" of a present, concrete controversy: detailed declarations describing their ongoing speech "arguably proscribed" by the Act, their intention to continue that speech, and operational consequences of the Act. S.A. 6–7. The Institute attested that it previously held mandatory meetings and retreats at which it communicated its policy views to all employees, and wishes to continue to do so, but is prohibited from doing so by Act. S.A. 6–7, 35–38. The Association likewise attested that its members' religious and policy-related meetings with employees are prohibited by the Act. S.A. 7, 37–38. By violating the Act, Plaintiffs face the risk of complaint, Department involvement, and $1,000-per-employee penalties "payable to the Department." 820 ILCS 57/25(a). That is more than the "abstract possibility" of enforcement *Whole Woman's Health*

---

[2] Briefing on both the motion to dismiss and the motion for preliminary injunction was completed by January 22, 2025, with Plaintiffs' most recent filing coming on January 8, 2025.

rejected; it is a concrete, ongoing chill backed by an operative enforcement regime that the Director continues to administer. *See* 595 U.S. at 47.

In a factual Rule 12(b)(1) challenge, the court may weigh evidence outside of the pleadings, but it still must read that evidence against the statute's text and undisputed facts about plaintiffs' intended conduct. *See Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 444 (7th Cir. 2009). The only "fact" the Director adduced on the threat of enforcement prong is her own present intention not to enforce the Act. Against the statutory text and Plaintiffs' unrefuted evidence of ongoing covered speech, that is plainly insufficient to negate a credible threat. *See Steffel*, 415 U.S. at 459; *Am. Booksellers*, 484 U.S. at 392–93; *Majors*, 317 F.3d at 721–23.

In short, *Ex parte Young* asks whether the Director is presently administering an allegedly unconstitutional legal regime and whether the requested relief is prospective. She is, and it is. The district court erred by importing an individualized "threatening and about to commence proceedings" gloss into *Ex parte Young* and by treating the Director's self-serving declaration as dispositive.

This Court should reverse and remand.

## II. Other federal courts have rejected similar sovereign-immunity arguments in challenges to captive-audience bans.

At least two other federal courts have addressed sovereign immunity issues in cases challenging similar captive-audience ban statutes that, like the Act, combine private rights of action with public enforcement authority.

In *Chamber of Commerce of the United States of America v. Bartolomeo*, business associations brought a pre-enforcement First Amendment and NLRA-preemption challenge to Connecticut's 2022 "captive-audience" law, Conn. Gen. Stat. § 31-51q. No. 3:22-cv-01373, Tr. of Bench Ruling at 41:12–41:22, 42:10–13 (D. Conn., June 28, 2023)[3]. That statute, like the Act, forbids employers from disciplining employees who refuse to attend meetings or receive communications concerning political or religious matters, including unionization. *Id*. at 41:17–41:25. It provides both a private right of action for employees and explicit enforcement powers for the Labor Commissioner and Attorney General, including investigatory authority and civil penalties under Conn. Gen. Stat. § 31-69a. *Id*. at 42:1–42:9. The district court denied sovereign-immunity dismissal as to the labor commissioner and attorney general, holding that they possessed direct, discretionary enforcement authority over the law, including the power to investigate employers, impose penalties, and prosecute civil actions, even though the commissioner claimed he would not investigate violations of the law. *Id*. at 48:21–49:17 (citing *Whole Woman's Health*, 595 U.S. at 45).

In *Minn. Chapter of Associated Builders v. Ellison*, 153 F.4th 695 (8th Cir. 2025), the Eighth Circuit addressed sovereign immunity claims by defendants—the attorney general, the department of labor and industry commissioner, and the

---

[3] The Connecticut district court issued its ruling in a bench decision. The transcript of the bench ruling was submitted to the district court as Exhibit A to Plaintiffs' Combined Response in Opposition to Defendant's Motion to Dismiss and Reply in Support of their Motion for Preliminary Injunction (Dkt. 27) and is part of the record on appeal.

governor—in a challenge to Minnesota's "Employer-Sponsored Meetings or Communications Act," Minn. Stat. § 181.531, which, like the Act, bars adverse action against employees who decline employer-sponsored meetings about religious or political matters and relies primarily on private civil actions for enforcement. *Id.* at 698.

The court held that there was no *Ex parte Young* jurisdiction against the governor. *Id.* at 699. The governor had no specific statutory enforcement power under the Minnesota statute. *Id.* And his public statements touting a ban on captive-audience meetings, combined with his ability to remove a commissioner who might not feel as zealous about the law did not create *Ex parte Young* jurisdiction. *Id.* The court held that removal of a commissioner is an administrative or ministerial act. *Id.*

The court found that the Commissioner's only assignment under the statute was to "develop an educational poster providing notice of employees' rights provided under this section"—a purely ministerial function, too attenuated from the statute's private cause of action to constitute the required connection to enforcement. *Id.* at 700. And although Minnesota law generally gave the commissioner the power to enter and inspect places of employment to "investigate facts, conditions, practices or matters as the commissioner deems appropriate to enforce the laws within the commissioner's jurisdiction," Minn. Stat. § 175.20, the court found that this general authority, without something specific to enforcement in the challenged statute, did

not rise to the level of enforcement needed to make her a proper *Ex parte Young* defendant. *Id.* at 701.

As to the attorney general, however, there was no dispute that Minnesota law—but not the Act specifically—gave him general authority to enforce the Act, among other things. *Id.* The question was whether he had sufficiently threatened to enforce the Act to make him a proper *Ex parte Young* defendant. *Id.* The court found that, in light of the law's private-enforcement structure, the lack of a specific enforcement mandate in the captive-audience law, and the Attorney General's disavowal, plaintiffs lacked a credible threat of enforcement sufficient for standing or *Ex parte Young* and dismissed the claims against him without prejudice. *Id.* at 700–01.

Critically, however, the Minnesota statute lacked the explicit, textually preserved enforcement track that the Act creates here. The Eighth Circuit stressed the absence of a specific enforcement mandate in the captive-audience law itself and relied heavily on the attorney general's disavowal in a context where the attorney general's general power to bring private suits to enforce Minnesota law was the only concrete enforcement mechanism. 153 F.4th at 700–01. By contrast, Illinois has chosen to assign the Department independent duties to "inquire," "exercise jurisdiction," engage in "administrative enforcement," and "institute the actions for the penalties" that are "payable to the Department." 820 ILCS 57/25(a), (b)(4)(C). Even on the Eighth Circuit's reasoning, that kind of express statutory assignment creates a much tighter enforcement connection than the one it confronted in Minnesota.

## III. States cannot evade pre-enforcement review by outsourcing enforcement to private parties.

Long-established precedent permits pre-enforcement First Amendment challenges to laws that chill speech. If accepted, the district court's sovereign-immunity theory would effectively prevent pre-enforcement review of any law that is enforced primarily through private civil actions. That outcome cannot be reconciled with decisions of the Supreme Court and this Court safeguarding pre-enforcement review in the First Amendment context.

For decades, courts have recognized that a plaintiff need not risk arrest or prosecution before seeking pre-enforcement relief where a law credibly threatens to chill protected expression. *Alvarez*, 679 F.3d at 591. In such cases, "a reasonable fear of prosecution can provide standing for a First Amendment challenge," *Goldhamer v. Nagode,* 621 F.3d 581, 586 (7th Cir. 2010), and "may . . . alone qualify as a cognizable Article III injury, provided the plaintiffs 'have alleged an actual and well-founded fear that the law will be enforced against them.'" *Ctr. for Individual Freedom v. Madigan*, 697 F.3d 464, 474 (7th Cir. 2012) (quoting *Am. Booksellers*, 484 U.S. at 393); *see also Babbitt*, 442 U.S. at 298–99, 302.

The Act plainly chills Plaintiffs' protected speech. It directly targets the way Plaintiffs communicate about "proposals to change legislation, proposals to change regulations, [and] proposals to change public policy," as well as religious matters, in mandatory staff meetings and other required communications. S.A. 35–38. Plaintiffs allege, and the record confirms, that they wish to continue these mandatory communications as part of their core mission. Faced with a statute that

makes such meetings unlawful and exposes them to complaints by employees and "interested parties," to investigations and cure demands by the Department, and to civil penalties "payable to the Department," 820 ILCS 57/20, 57/25(a)–(c), (e), Plaintiffs have a well-founded fear that the Act will be used against them if they continue speaking. That is precisely the kind of chill that the Supreme Court has deemed sufficient for pre-enforcement review.

The district court's sovereign-immunity decision would nullify those precedents whenever a state channels enforcement through private lawsuits. Under its ruling, because interested parties and employees, rather than the Director, file the civil actions that ultimately impose penalties, no state official can be sued in federal court before those suits are filed. That is the very sort of evasion of review the Supreme Court has repeatedly rejected.

In *Whole Woman's Health v. Jackson*, the Court squarely rejected the proposition that Texas could "insulate" a concededly controversial statute from federal review merely by delegating enforcement to private parties. While the Court held that judges, clerks, and certain executive officers were improper defendants on the specific record there, it reaffirmed that *Ex parte Young* remains available against state officials who have a meaningful role in implementing such schemes. *See id.* at 45–47 (holding that licensing-official defendants continued to have enforcement duties preserved by the statute's savings clause). As Chief Justice Roberts explained, by making private civil actions the primary enforcement mechanism, Texas had "employed an array of stratagems designed to shield its unconstitutional

law from judicial review." *Id*. at 59, 62 (Roberts, C.J., concurring in the judgment in part and dissenting in part).

To be clear, Plaintiffs do not contend that every statute enforced solely by private civil actions automatically supports an *Ex parte Young* suit against some state official. *Whole Woman's Health* rejected that position with respect to judges, clerks, and certain officials who had no enforcement role under the statute there. 595 U.S. at 39–41. But the Court confirmed that where state law assigns ongoing enforcement duties to executive officials *Ex parte Young* remains available. *Id.* at 45–47. This case falls on that side of the line: the Act empowers the Director to receive complaints, demand cures, issue right-to-sue notices, and collect penalties payable to the Department.

Nor may a state official accomplish indirectly what she could not accomplish directly. In *NRA of Am. v. Vullo*, 602 U.S. 175 (2024), the Court held that state officials violate the First Amendment when they leverage their regulatory powers to coerce private actors to suppress disfavored speech, even if the formal censorship is carried out by private entities. *Id.* at 190. The same principle applies here: the State cannot insulate an unconstitutional speech restriction from pre-enforcement scrutiny simply by deputizing private parties to wield the threat of civil penalties while keeping state officials just far enough in the background to claim immunity.

Other federal courts and commentators have recognized the dangers of this "private enforcement" model as a tool to avoid judicial review. *See, e.g., Whole Woman's Health*, 595 U.S. at 59 (Roberts, C.J., concurring in the judgment in part

and dissenting in part) (warning that if such schemes are permitted to stand, "states could replicate [this] approach and further insulate their laws from judicial review"); Leah M. Litman, *Privately Enforced Laws and the Future of Pre-Enforcement Review*, 131 Yale L.J.F. 1, 3–6 (2021) (explaining how privatized enforcement mechanisms are designed to "circumvent pre-enforcement challenges" and "chill the exercise of constitutional rights" by imposing asymmetric risks on speakers). Allowing sovereign immunity here would invite precisely that sort of gamesmanship in the First Amendment context.

The district court's holding means that no state official could ever be sued in federal court to enjoin the Act before private plaintiffs start filing suits. Plaintiffs—and every employer in Illinois—would be forced to choose between continuing their speech and risking repeated, costly private enforcement actions and statutory penalties, or altering or abandoning speech the First Amendment protects. Faced with that choice, "the chilling effect alone" is a serious constitutional injury. *Alvarez*, 679 F.3d at 590. And as the Supreme Court has emphasized in analogous contexts, "[w]here the threatened enforcement effort implicates First Amendment rights, the 'danger of chilling free speech'" is particularly acute. *Vullo*, 602 U.S. at 186 (citation omitted).

The *Ex parte Young* exception exists precisely to prevent states from "nullify[ing] federal law" through formalistic invocations of immunity. *Green v. Mansour*, 474 U.S. 64, 68 (1985). It cannot turn on whether a legislature chooses to invest enforcement authority in prosecutors, licensing officials, or nominally "private"

plaintiffs acting with the State's blessing and backed by state-administered penalties. So long as a state official—here, the Director—continues to administer the complaint, cure, right-to-sue, and penalty apparatus that enforces the Act and chills Plaintiffs' speech, there is an ongoing violation of federal law, and prospective relief against that official is available under *Ex parte Young*.

Accepting the district court's holding would provide a simple blueprint for states to insulate unconstitutional speech restrictions from pre-enforcement review: delegate primary enforcement to private parties, strip obvious prosecutorial hooks, and then invoke sovereign immunity when sued. The Supreme Court's pre-enforcement and *Ex parte Young* precedents foreclose that result. The exception to sovereign immunity applies here because the Director continues to administer at least part of the Act's enforcement regime; holding otherwise would undermine well-established constitutional principles and invite precisely the end-run around judicial review that *Whole Woman's Health* and *Vullo* caution against.

## Conclusion

The district court erred in concluding that the Director was entitled to sovereign immunity because the *Ex parte Young* doctrine did not apply to Plaintiffs' claims. First, it erred by holding that the Director lacks enforcement authority under the Act. Second, it erred by concluding that there was no ongoing violation of federal law because the Director has not expressly threatened enforcement against Plaintiffs. Plaintiffs respectfully request that this Court reverse the judgment of the district court and remand for further proceedings on the merits.

Dated: January 7, 2026

Respectfully submitted,

/s/ Jeffrey M. Schwab

Jeffrey M. Schwab
James McQuaid
LIBERTY JUSTICE CENTER
7500 Rialto Blvd., Suite 1-250
Austin, Texas 78735
512-481-4400
jschwab@ljc.org
jmcquaid@ljc.org

*Attorneys for Plaintiffs-Appellants*

**Certificate of Compliance**

I certify that this brief conforms to the type-volume limitations imposed by

Fed. R. App. P. 32 and Circuit Rule 32 for a brief produced using the following font:

Proportional Century Schoolbook Font 12-point for body text, 12-point for footnotes.

Microsoft Word for Mac was used. The length of this brief was 11,291 words.

/s/ Jeffrey M. Schwab
Jeffrey Schwab

**Certificate of Service**

I hereby certify that on January 7, 2026, I electronically filed the foregoing

Appellants' Brief with the Clerk of the Court for the United States Court of Appeals

for the Seventh Circuit by using the CM/ECF system. I certify that all participants

in the case are registered CM/ECF users and that service will be accomplished by

the CM/ECF system.

/s/ Jeffrey M. Schwab
Jeffrey Schwab

# Statutory Addendum

(820 ILCS 57/1)
Sec. 1. Short title. This Act may be cited as the Worker Freedom of Speech Act.

(Source: P.A. 103-722, eff. 1-1-25.)

(820 ILCS 57/5)
Sec. 5. Findings; legislative intent.

(a) The General Assembly finds that it is in the public policy interests of the State for all working Illinoisans to have protections from mandatory participation in employer-sponsored meetings if the meeting is designed to communicate an employer's position on religious or political matters.

(b) Employees should not be subject to intimidation tactics, acts of retaliation, discipline, or discharge from their employer for choosing not to participate in employer-sponsored meetings.

(Source: P.A. 103-722, eff. 1-1-25.)

(820 ILCS 57/10)
Sec. 10. Definitions. As used in this Act:

"Department" means the Department of Labor.

"Director" means the Director of Labor.

"Employee" has the meaning given in Section 2 of the Illinois Wage Payment and Collection Act.

"Employer" has the meaning given in Section 2 of the Illinois Wage Payment and Collection Act.

"Employer" includes the State or any political subdivision of the State, unit of local government, or State or local government agency.

"Interested party" means an organization that monitors or is attentive to compliance with public or worker safety laws, wage and hour requirements, or other statutory requirements.

"Political matters" means matters relating to elections for political office, political parties, proposals to change legislation, proposals to change regulations, proposals to change public policy, and the decision to join or support any political party or political, civic, community, fraternal, or labor organization.

"Religious matters" means matters relating to religious belief, affiliation, and practice and the decision to join or support any religious organization or association.

"Voluntary" means, with respect to an action, that the action is not:

(1) incentivized by a positive change in any employment condition, including, but not limited to, any form of compensation or any other benefit of employment; and

(2) taken under threat of a negative change in any employment condition for non-attendance, including, but not limited to, the provisions set forth in Section 15, any negative performance evaluation, or any other adverse change in any form of compensation or any other benefit of employment.

(Source: P.A. 103-722, eff. 1-1-25.)

(820 ILCS 57/15)
Sec. 15. Employee protections. An employer or the employer's agent, representative, or designee may not discharge, discipline, or otherwise penalize, threaten to discharge, discipline, or otherwise penalize, or take any adverse employment action against an employee:

(1) because the employee declines to attend or participate in an employer-sponsored meeting or declines to receive or listen to communications from the employer or the agent, representative, or designee of the employer if the meeting or communication is to communicate the opinion of the employer about religious matters or political matters;

(2) as a means of inducing an employee to attend or participate in meetings or receive or listen to communications described in paragraph (1); or

(3) because the employee, or a person acting on behalf of the employee, makes a good faith report, orally or in writing, of a violation or a suspected violation of this Act.

(Source: P.A. 103-722, eff. 1-1-25.)

(820 ILCS 57/20)
Sec. 20. Right of action. An aggrieved employee may bring a civil action to enforce any provision of this Act no later than one year after the date of the alleged violation. A civil action may be brought by one or more employees for and on behalf of themselves and other employees similarly situated. The court may award a prevailing employee all appropriate relief, including injunctive relief, reinstatement to the employee's former position or an equivalent position, back pay, reestablishment of any employee benefits, including seniority, to which the employee would otherwise have been eligible if the violation had not occurred, and any other appropriate relief as deemed necessary by the court to make the employee whole. The court shall award a prevailing employee reasonable attorney's fees and costs.

(Source: P.A. 103-722, eff. 1-1-25.)

(820 ILCS 57/25)
Sec. 25. Powers of the Department and civil penalties.

(a) The Department shall inquire into any alleged violations of this Act, brought to its attention by an interested party, to institute the actions for the penalties provided in this Section and to enforce the provisions of this Act. In addition to the relief set forth in Section 20, an employer shall be assessed a civil penalty of $1,000 for each violation of Section 15, payable to the Department. Each employee who is subject to a violation of Section 15 shall constitute a separate violation.

(b) Upon a reasonable belief that an employer covered by this Act is in violation of any part of this Act, an interested party may assert that a violation of this Act has occurred and bring an action for penalties in the county where the violation is alleged to have occurred or where the principal office of the employer is located, pursuant to the following sequence of events:

(1) The interested party submits to the Department a complaint describing the violation and naming the employer alleged to have violated this Act.

(2) The Department sends notice of complaint to the named party alleged to have violated this Act and the interested party. The named party may either contest the alleged violation or cure the alleged violation.

(3) The named party contests or cures the alleged violation within 30 days after the receipt of the notice of complaint or, if the named party does not respond within 30 days, the Department issues a notice of right to sue to the interested party as described in paragraph (4).

(4) The Department issues a notice of right to sue to the interested party, if one or more of the following has occurred:

(A) the named party has cured the alleged violation to the satisfaction of the Director;

(B) the Director has determined that the allegation is unjustified or that the Department does not have jurisdiction over the matter or the parties; or

(C) the Director has determined that the allegation is justified or has not made a determination, and either has decided not to exercise jurisdiction over the matter or has concluded administrative enforcement of the matter.

(c) If, within 180 days after service of the notice of complaint to the parties, the Department has not (i) resolved the contest and cure period, (ii) with the mutual agreement of the parties, extended the time for the named party to cure the violation and resolve the complaint, or (iii) issued a right to sue letter, the interested party may initiate a civil action for penalties. The parties may extend the 180-day period by mutual agreement. The limitations period for the interested party to bring an action for the alleged violation of this Act shall be tolled for the 180-day period and for the period of any mutually agreed extensions. At the end of

the 180-day period, or any mutually agreed extensions, the Department shall issue a right to sue letter to the interested party.

(d) Any claim or action filed under this Section must be made within 3 years after the alleged conduct resulting in the complaint plus any period for which the limitations period has been tolled.

(e) In an action brought under this Section, an interested party may recover against the employer any statutory penalties set forth in subsection (a) and injunctive relief. An interested party who prevails in a civil action shall receive 10% of any statutory penalties assessed, plus any attorney's fees and expenses in bringing the action.

(f) Nothing in this Section shall be construed to prevent an employee from bringing a civil action for the employee's own claim for a violation of this Act as described in Section 20.

(Source: P.A. 103-722, eff. 1-1-25.)

(820 ILCS 57/30)
Sec. 30. Notice. Within 30 days after the effective date of this Act, an employer shall post and keep posted a notice of employee rights under this Act where employee notices are customarily placed.

(Source: P.A. 103-722, eff. 1-1-25.)

(820 ILCS 57/35)
Sec. 35. Exceptions. Nothing in this Act:

(1) prohibits communications of information that the employer is required by law to communicate, but only to the extent of the lawful requirement;

(2) limits the rights of an employer or its agent, representative, or designee to conduct meetings involving religious matters or political matters, so long as attendance is voluntary, or to engage in communications, so long as receipt or listening is voluntary;

(3) limits the rights of an employer or its agent, representative, or designee from communicating to its employees any information that is necessary for the employees to perform their required job duties;

(4) prohibits an employer or its agent, representative, or designee from requiring its employees to attend any training intended to foster a civil and collaborative workplace or reduce or prevent workplace harassment or discrimination;

(5) prohibits an institution of higher education, or any agent, representative, or designee of the institution, from conducting meetings or participating in any communications with its employees concerning any coursework, symposia, research, publication, or an academic program at the institution;

(6) prohibits a political organization, a political party organization, a caucus organization, a candidate's political organization, or a not-for-profit organization that is exempt from taxation under Section 501(c)(4), 501(c)(5), or 501(c)(6) of the Internal Revenue Code from requiring its staff or employees to attend an employer-sponsored meeting or participate in any communication with the employer or the employer's agent, representative or designee for the purpose of communicating the employer's political tenets or purposes;

(7) prohibits the General Assembly or a State or local legislative or regulatory body from requiring its employees to attend an employer-sponsored meeting or participate in any communication with the employer or the employer's agent, representative, or designee for the purpose of communicating the employer's proposals to change legislation, proposals to change regulations, or proposals to change public policy; or

(8) prohibits a religious organization from requiring its employees to attend an employer-sponsored meeting or participate in any communication with the employer or the employer's agent, representative, or designee for the purpose of communicating the employer's religious beliefs, practices, or tenets.

(Source: P.A. 103-722, eff. 1-1-25; 104-417, eff. 8-15-25.)

# Required Short Appendix

### Contents

District Court Order, Dkt. 38, September 30, 2025.........................................S.A. 1

District Court Judgment, Dkt. 45, November 4, 2025...................................S.A. 26

Consent Motion for Judgment, Dkt. 44, November 4, 2025 .........................S.A. 27

Order granting Consent Motion, Dkt. 46, November 4, 2025 .....................S.A. 29

First Amended Complaint, Dkt. 8, October 30, 2024 ...................................S.A. 30

### Certificate

Pursuant to Circuit Rule 30(d), I hereby certify that this short appendix includes all the materials required by Circuit Rules 30(a) and (b).

/s/ Jeffrey M. Schwab

Counsel for Plaintiffs-Appellants

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ILLINOIS POLICY INSTITUTE and THE TECHNOLOGY & MANUFACTURING ASSOCIATION, | |
| Plaintiffs, | No. 24-cv-06976 Judge Franklin U. Valderrama |
| v. | |
| JANE R. FLANAGAN, in her official capacity as Director of the Illinois Department of Labor, | |
| Defendant. | |

**ORDER**

Free speech is a bedrock principle of democracy in the United States. In the marketplace of ideas, discussion about politics and religion has always been fertile ground for debate and disagreement. Recognizing the latter, the Illinois General Assembly found it to be "in the public policy interests of the State for all working Illinoisans to have protections from mandatory participation in employer-sponsored meetings if the meeting is designed to communicate an employer's position on religious or political matters." 820 ILCS 57/5. The Assembly therefore passed the Worker Freedom of Speech Act (the Act), which became effective on January 1, 2025 and bans any sort of adverse action against employees who "decline[] to attend or participate in an employer-sponsored meeting or decline[] to receive or listen to communications from the employer … if the meeting or communication is to communicate the opinion of the employer about religious matters or political matters." *Id.* 57/15(1).

According to Plaintiffs Illinois Policy Institute (IPI) and Technology & Manufacturing Association (TMA), the Act violates Plaintiffs' First Amendment rights to free speech. R. 8,[1] Am. Compl. Plaintiffs sued Defendant Jane R. Flanagan, in her official capacity as Director of the Illinois Department of Labor (the Director), seeking a declaratory judgment regarding the invalidity of the Act. *Id.* Plaintiffs also filed a motion for a preliminary injunction, seeking an order enjoining the Director from implementing and enforcing the Act. R. 9, Mot. Prelim. Inj. The Director filed a motion to dismiss for lack of subject matter jurisdiction based on Eleventh Amendment sovereign immunity and Plaintiffs' lack of Article III standing. R. 19, Mot. Dismiss. For the following reasons, the Court grants the Director's motion to dismiss. Because the Court finds that it lacks subject matter jurisdiction, it terminates Plaintiffs' motion for a preliminary injunction.

## Legal Standard

A Rule 12(b)(1) motion tests whether the court has subject matter jurisdiction. *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). To survive a Rule 12(b)(1) motion, the plaintiff bears the burden of establishing subject matter jurisdiction. *Ctr. for Dermatology & Skin Cancer, Ltd. v. Burwell*, 770 F.3d 586, 588–89 (7th Cir. 2014). When deciding a facial challenge to subject matter jurisdiction—that is, when the defendant argues that the plaintiff's *allegations* as to jurisdiction are inadequate—"the district court must accept as true all well-pleaded factual allegations, and draw reasonable inferences in

---

[1]Citations to the docket are indicated by "R." followed by the docket number or filing name, and, where necessary, a page or paragraph citation.

favor of the plaintiff." *Ezekiel v. Michel*, 66 F.3d 894, 897 (7th Cir. 1995). But district courts may also "look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether *in fact* subject matter jurisdiction exists." *Taylor v. McCament*, 875 F.3d 849, 853 (7th Cir. 2017) (citing *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 444 (7th Cir. 2009)). In that case, "no presumptive truthfulness attaches to plaintiff's allegations," and the court is "free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Apex Digital*, 572 F.3 at 444 (cleaned up).[2] "[A] proponent of federal jurisdiction must, if material factual allegations are contested, prove those jurisdictional facts by a preponderance of the evidence." *Meridian Sec. Ins. Co. v. Sadowski*, 441 F.3d 536, 543 (7th Cir. 2006).

The Director has raised a factual challenge, as she has submitted evidence calling the Court's jurisdiction into question. *Apex Digital*, 572 F.3 at 444; *see also Sapperstein v. Hager*, 188 F.3d 852, 855 (7th Cir. 1999) (factual challenge arises "[w]here evidence pertinent to subject matter jurisdiction has been submitted").

## Background

### A. The Act

The Act, which went into effect on January 1, 2025, provides that an employer "may not discharge, discipline, or otherwise penalize, threaten to discharge, discipline, or otherwise penalize, or take any adverse employment action against an

---

[2]This Order uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

employee" who engages in certain protected activities. 820 ILCS 57/15. The Act defines three types of protected activity. The primary type is to "decline[] to attend or participate in an employer-sponsored meeting or decline[] to receive or listen to communications from the employer . . . if the meeting or communication is to communicate the opinion of the employer about religious matters or political matters." *Id.* 57/15(1). The others derive from the first: an employer may not retaliate "as a means of inducing an employee" to attend or listen, and an employer may not retaliate against an employee who reports "a violation or a suspected violation" of the Act. *Id.* 57/15(2)–(3). There are eight exceptions to the Act's protections. *See id.* 57/35. For example, the Act does not limit "voluntary" attendance at meetings or receipt or communications, nor does it prohibit mandatory meetings at which an employer communicates "to its employees any information that is necessary for the employees to perform their required job duties." *Id.* 57/35(2)–(3).

Central to the Director's motion to dismiss is her ability to enforce the Act. More broadly, as she points out in her motion to dismiss, the Director lacks general enforcement powers that would apply to the Act. R. 20, Memo. Dismiss at 3. The Illinois Civil Administrative Code creates the Department of Labor (the Department), 20 ILCS 5/5-15, but grants it only aspirational powers, such as "to foster, promote, and develop the welfare of wage earners." *Id.* 1505/1505-15. The Director has no overarching authority of investigation or enforcement as to Chapter 820 of the Illinois Compiled Statutes, where employment laws are found. *See* R. 20-1, Flanagan Decl. ¶¶ 4–6. Instead, each Illinois statute sets forth the Director's specific powers under

that statute. Memo. Dismiss at 3 (citing, *inter alia*, 820 ILCS 105/7 (Minimum Wage Law); *id.* 115/11 (Wage Payment and Collection Act)).

The Act itself creates two enforcement mechanisms: a private right of action for an "aggrieved employee," 820 ILCS 57/20, and a provision whereby an "interested party" may bring an alleged violation to the attention of the Director, *id.* 57/25. The parties focus on the latter mechanism, which authorizes the Department to "inquire into any alleged violations" that are "brought to its attention by an interested party, to institute the actions for the penalties provided in this Section and to enforce the provisions of this Act." *Id.* 57/25(a).

Section 25 lays out the complaint process, providing that (1) the interested party files a complaint with the Department, (2) the Department notifies the named party of the complaint, after which the named party may contest or cure the alleged violation, and (3) depending on how the named party responds, the Department may issue a "notice of right to sue to the interested party." 820 ILCS 57/25(b). On the third step, Section 25 provides that "[t]he Department issues a notice of right to sue to the interested party, if one or more of the following has occurred: (A) the named party has cured the alleged violation to the satisfaction of the Director; (B) the Director has determined that the allegation is unjustified or that the Department does not have jurisdiction over the matter or the parties; or (C) the Director has determined that the allegation is justified or has not made a determination, and either has decided not to exercise jurisdiction over the matter or has concluded administrative enforcement of the matter." *Id.* 57/25(b)(4). If the Department does not take action

within 180 days after service of the notice of complaint to the parties, by issuing a notice of right to sue or otherwise, then "the interested party may initiate a civil action for penalties." *Id.* 57/25(c). Under this Section, an employer is assessed a civil penalty of $1,000 per violation payable to the Department. *Id.* 57/25(a). "An interested party who prevails in a civil action" receives "10% of any statutory penalties assessed." *Id.* 57/25(e).

The Director submitted a declaration in support of her motion to dismiss, in which she states that she does not understand the Act, or any other part of the Illinois Compiled Statutes, to grant her power to enforce the Act beyond informing a defendant when a complaint has been filed against it and sending the "notice of right to sue" after 180 days. Flanagan Decl. ¶¶ 4–12. She also states that, as of December 20, 2024, she was not aware of any "interested party" who intended to file a complaint under the Act against IPI. *Id.* ¶ 13.

### B. Plaintiffs

IPI is a 501(c)(3) nonprofit organization that engages in speech on "political" matters. Specifically, IPI engages in, and publishes research related to, public policy from a perspective that favors, among other things, civil and personal liberties; effective, efficient, honest, and transparent government; limited government; free markets; and workers' freedom to choose whether to join a labor union. R. 10, Paprocki Decl. ¶¶ 3, 8. IPI regularly conducts mandatory staff meetings and twice-yearly retreats where the organization's views on questions of public policy are expressed. *Id.* ¶¶ 4–7. Not all the communications at IPI's meetings are necessary for

*all* employees present to perform their job duties; that is, not every IPI employee's job directly relates to every political matter IPI discusses. *Id.* ¶¶ 6, 9–11.

IPI's president and CEO, Matthew Paprocki's declaration states that, even if the meetings are not necessary for every employee, it is important for the functioning of IPI to communicate about political matters with its employees, such as in mandatory meetings. Paprocki Decl. ¶ 9. According to Paprocki, IPI believes that each of its employees should know what IPI's various teams and experts are working on, and that the quality of the organization's work is improved when staffers not working on a specific policy-related matter can bring an interesting idea or new perspective on how to approach an issue. *Id.* ¶ 10. Team morale, connection to the organization, and idea generation would all suffer if IPI were required to conduct staff meetings without providing policy-related information to all staff. *Id.* ¶ 11.

TMA is a "501(c)(6) independent trade organization that focuses on assisting and promoting small and mid-size manufacturers, by, among other things, providing information, training, resources, and advocacy for and on behalf of its members." R. 10-1, LaComb Decl. ¶ 3; *see also* R. 20-8. Many of TMA's members have communicated political and religious matters to their employees in mandatory meetings. LaComb Decl. ¶ 7. TMA's members wish to continue to discuss political and religious matters with their employees, including communications in which those employees are required as a condition of their employment to listen. *Id.* ¶ 11.

The Director moves to dismiss Plaintiffs' lawsuit under Federal Rule of Civil Procedure 12(b)(1).

## Analysis

The Director contends that the Court lacks subject matter jurisdiction because: (1) Plaintiffs cannot establish the *Ex parte Young* exception to sovereign immunity because they have not sued an "officer[] of the state . . . who threaten[s] and [is] about to commence proceedings" against them, 209 U.S. 123, 155–56 (1908); and (2) Plaintiffs cannot show Article III standing, as their injuries depend on the speculative possibility of private suits against them and no relief granted against the Director could prevent such suits. Memo. Dismiss. The Court starts with the Director's sovereign immunity argument.

The Eleventh Amendment provides, "[t]he judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another state, or by citizens or subjects of any foreign state." U.S. Const. amend XI. Eleventh Amendment sovereign immunity generally bars federal lawsuits against states, state agencies, and state officials acting in their official capacities. *Council 31 of the Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Quinn*, 680 F.3d 875, 881 (7th Cir. 2012); *see also Whole Woman's Health v. Jackson*, 595 U.S. 30, 39 (2021). The Supreme Court created an exception to this bar, however, in *Ex parte Young*, allowing "private parties to sue individual state officials for prospective relief to enjoin ongoing violations of federal law." *Council 31*, 680 F.3d at 882 (cleaned up). Essentially, the Supreme Court said that "a suit challenging the constitutionality of a state official's action in enforcing state law is not one against the State." *Green v. Mansour*, 474 U.S. 64, 68 (1985)

(cleaned up). Under *Ex parte Young*, "federal courts cannot repeal state laws"; they can at most "prevent[] state officials from enforcing the challenged statute, regulation, or agency action in the future based on its incompatibility with federal law." *Driftless Area Land Conservancy v. Valcq*, 16 F.4th 508, 521–22 (7th Cir. 2021). The exception is "narrow." *Whole Woman's Health*, 595 U.S. at 39.

To determine whether the *Ex parte Young* doctrine applies, the Court "need only conduct a 'straightforward inquiry' into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Maryland Inc. v. Public Service Comm'n of Maryland*, 535 U.S. 635, 645 (2002). As the Director argues, since she raises a factual challenge to jurisdiction, Plaintiffs "bear[] the burden of coming forward with competent proof that [jurisdiction] exists." Memo. Dismiss at 8 (quoting *Apex Digital*, 572 F.3d at 444). From the Director's perspective, Plaintiffs cannot prove either element. Memo. Dismiss at 8.

First, to establish "an ongoing violation of federal law," Plaintiffs must "direct" the Court to some "enforcement authority the [Director] possesses in connection with [the Act] that a federal court might enjoin [her] from exercising." *Whole Woman's Health*, 595 U.S. at 43; *see also Doe v. Holcomb*, 883 F.3d 971, 975 (7th Cir. 2018) ("[A] plaintiff must show that the named state official plays some role in enforcing the statute in order to avoid the Eleventh Amendment."). A violation is not "ongoing" if the defendant official lacks "the power to enforce, modify, or rescind" the challenged policy. *Driftless Area Land Conservancy*, 16 F.4th at 515. Second, Plaintiffs must

show that the Director is "about to commence proceedings, either of a civil or criminal nature, to enforce against [them] an unconstitutional act." *Ex parte Young*, 209 U.S. at 156; *see also Holcomb*, 883 F.3d at 977 (claim dismissed where "[t]he Attorney General has not threatened to do anything"). The Court starts with the Director's enforcement powers under the Act.

## I.    The Director's Authority to Enforce the Act

Recall, the Director takes the position that she possesses no "enforcement authority" under the Act that the Court can "enjoin [her] from exercising." Memo. Dismiss at 9 (quoting *Whole Woman's Health*, 595 U.S. at 43). The Director argues that the Act only gives her the authority to "inquire into any alleged violations," but not even independently—such alleged violations must be brought to her attention by an "interested party." 820 ILCS 54/25(a). This inquiry power, she posits, has no teeth, as she does not even have the power to issue subpoenas to support her inquiry. Memo. Dismiss at 9 (citing Flanagan Decl. ¶ 7). Moreover, only third parties, not the Director, have the power to file complaints to start a possible suit. *Id.* (citing 820 ILCS 57/25(b), (d)). Even her power to "issue[] a notice of right to sue" is divorced from the merits: it issues whether the Director believes the allegation was "cured," "unjustified," or "justified," or even if the Director "has not made a determination." *Id.* (citing 820 ILCS 57/25(b)(4)). And, even if the Director fails to issue a notice of right to sue, an interested party "may initiate a civil action for penalties" after 180 days, *id.* at 9–10 (citing 820 ILCS 57/25(c)), a fact that Plaintiffs concede, *id.* at 10 (citing R. 9-1, Pls.' Memo. Prelim. Inj. at 4). Therefore, argues the Director, she "was

not specifically charged with a duty to enforce" the Act through Section 25, and indeed "cannot do anything . . . to prosecute a violation of" the Act, meaning she retains her sovereign immunity. *Id.* (quoting *Holcomb*, 883 F.3d at 976–77).

Predictably, Plaintiffs disagree, taking the position that the Act explicitly gives the Director enforcement power, in that it provides that "[t]he Department shall inquire into any alleged violations of this Act, brought to its attention by an interested party, to institute the actions for the penalties provided in this Section and *to enforce the provisions of this Act*." R. 27, Resp. at 4 (quoting 820 ILCS 57/25(a) (emphasis in Response)). Moreover, point out Plaintiffs, the Act empowers the Department to demand that an employer "cure" a violation of the Act, and also acknowledges that the Director may "exercise jurisdiction" over a complaint brought to the Department alleging a violation of the Act and conduct "administrative enforcement of the matter." *Id.* (quoting 820 ILCS 25/b). Therefore, argue Plaintiffs, the Director is not merely a passive party with no enforcement "teeth" under the Act. *Id.*

Plaintiffs also argue—and the Director does not dispute—that, for purposes of *Ex parte Young*, "enforcement" does not refer only to prosecutorial means of enforcement. Resp. at 4 (citing Black's Law Dictionary (12th ed. 2024) (defining "enforce" as "[t]o give force or effect to (a law, etc.)")). The Court agrees. And Plaintiffs are correct that the Director need not be the primary authority responsible for enforcing a challenged law in order to satisfy *Ex parte Young*. *Id.* at 4–5 (citing *281 Care Comm. v. Arneson*, 638 F.3d 621, 632 (8th. Cir. 2011); *see also Reprod. Health Servs. of Planned Parenthood of the St. Louis Region, Inc. v. Nixon*, 428 F.3d 1139,

S.A. 11

1145–46 (8th Cir. 2005)). The question then, is whether the Director plays "some role in enforcing the statute," such that enjoining her role in that enforcement would stop a constitutional violation. *Holcomb*, 883 F.3d at 975–76.

The Court now turns to the parties' arguments about what powers the plain language of the Act gives to the Director. *See* R. 28, Reply at 4 (citing Flanagan Decl. ¶¶ 4–6 (the Director has no overarching powers beyond those conferred by specific Illinois statutes)). The Court applies Illinois law to the statutory interpretation. *Id.* (citing *Whole Woman's Health*, 595 U.S. at 47 ("[State] courts and not this one are the final arbiters of the meaning of state statutory directions.")).

Starting with the Director's power "to institute the actions for the penalties provided in this Section and to enforce the provisions of this Act," 820 ILCS 57/25(a), the Court agrees with the Director that, in context, this sentence confers no cause of action on the Director. Reply at 4 (citing *In re Marriage of Goesel*, 102 N.E.3d 230, 235 (Ill. 2017) ("Words and phrases should not be viewed in isolation but should be considered in light of other relevant provisions of the statute.")). The "actions" provided in Section 25 are limited to interested third parties' authority to initiate civil actions. 820 ILCS 57/25(c). This limitation is bolstered by the statute of limitations provision, which states that "[a]ny claim or action filed under this Section must be made within 3 years after the alleged conduct *resulting in the complaint.*" *Id.* 57/25(d). Only third parties can bring complaints. *Id.* 25(b)(1).

True, as Plaintiffs point out, the Director can demand that an employer "cure" alleged violations. Resp. at 4 (citing 820 ILCS 57/25(b)). But, as the Director argues

and as her counsel noted during oral argument,[3] regardless of the action taken during the 180-period following service of the notice of complaint to the parties, an interested party can file a civil lawsuit; that is all roads lead to the interested party being able to file a lawsuit. Memo. Dismiss at 9–10 (citing 820 ILCS 57/25(c)). So, enjoining the Director from demanding that employers cure alleged violations would not stop interested parties from being able to file civil suits. *See Whole Woman's Health*, 595 U.S. at 44) ("Supposing the attorney general did have some enforcement authority under S. B. 8, the petitioners have identified nothing that might allow a federal court to parlay that authority, or any defendant's enforcement authority, into an injunction against any and all unnamed private persons who might seek to bring their own S. B. 8 suits.").

As to the language providing that the Director has the power to "enforce the provisions of the Act," the Court again agrees with the Director that such vague language, in itself, does not provide her with meaningful enforcement power: Section 25 and Section 20 provide express rights of action to interested third parties and to employers. Reply at 5 (citing 820 ILCS 25(a), (b)); 820 ILCS 20; *see also Minnesota Chapter of Associated Builders & Contractors v. Ellison*, 2025 WL 2526268, at *4 (8th Cir. Sept. 3, 2025) (holding Commissioner of Minnesota's Department of Labor and Industry was immune from the plaintiff's challenge to a similar law, where the law provided the Commissioner the "authority to 'enter . . . and inspect places of employment' and to 'investigate facts, conditions, practices or matters as the

---

[3]The Court held oral argument on the motion to dismiss on June 11, 2025. R. 35.

commissioner deems appropriate to enforce the laws' within her jurisdiction. Although this section is titled 'Enforcement' and gives the Commissioner power 'to enforce' the laws within her jurisdiction, the use of 'enforce' is not dispositive. The substance of the law is.") (citing *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 544–45 (2012)). And, as the Director points out, other statutes explicitly provide the Director with a cause of action. Reply at 5 (citing, *inter alia*, 820 ILCS 105/12(b) ("the Director . . . may bring any legal action necessary to recover the amount of the unpaid minimum wages"); *id.* 115/11(c) (empowering the Department "[t]o make complaint in any court of competent jurisdiction of violations of this Act")).

The closer call relates to language contained in Section 25(b)(4)(C), which provides that, before issuing a right-to-sue letter, the Director may decline "jurisdiction" or "conclude[] administrative enforcement of the matter." 820 ILCS 57/25(b)(4)(C). The Director argues that such language is surplusage that has no effect under this Act, and was merely imported wholesale from a different law, the Day and Temporary Labor Services Act (which provides the Director with administrative investigation and enforcement powers in other sections). Memo. Dismiss at 10 n.1 (citing 820 ILCS 175/67, 55, 70–75). Plaintiffs retort that "[n]o rule of construction authorizes this court to declare that the legislature did not mean what the plain language of the statute imports, nor may [it] rewrite a statute to add provisions or limitations the legislature did not include." Resp. at 5–6 (citing *DiFranco v. City of Chicago*, 589 F. Supp. 3d 909, 918 (N.D. Ill. 2022) (quoting *People v. Legoo*, 178 N.E.3d 1110, 1116 (Ill. 2020)). There is no reason, argue Plaintiffs, to

ignore the plain language of the Act, which explicitly states that the Director may exercise jurisdiction and conduct administrative enforcement in response to a third-party complaint. *Id.* at 6. In reply, the Director argues that under Illinois law, "every clause of a statute must be given a reasonable meaning, *if possible*, and should not be rendered meaningless or superfluous." Reply at 5 (quoting *Schultz v. St. Clair Cnty.*, 201 N.E.3d 1111, 1117 (Ill. 2022) (emphasis in Reply); citing *Crozer v. People*, 69 N.E. 489, 491 (Ill. 1903) ("if it can be prevented")). It is not "possible," contends the Director, to give meaning to "jurisdiction" or "administrative enforcement," as, to give them meaning, these words would need a predicate cause of action that the General Assembly did not provide. *Id.*

Determining the meaning of Section 25(b)(4)(C) presents an issue of statutory interpretation. "The fundamental rule of statutory interpretation is to ascertain and give effect to the legislature's intent, and the best indicator of that intent is the statutory language, given its plain and ordinary meaning." *Chapman v. Chicago Dep't of Fin.*, 220 N.E.3d 1080, 1085 (Ill. 2023) (cleaned up). As stated above, in determining the meaning of a statute, "[e]ach word, clause, and sentence of a statute must be given a reasonable meaning, if possible, and should not be rendered superfluous." *Chicago Tchrs. Union, Loc. No. 1 v. Bd. of Educ. of City of Chicago*, 963 N.E.2d 918, 923 (Ill. 2012). True, as Plaintiffs point out, the Court must give effect to the plain language of the statute, but here, as the Director argues, there is no other language in the Act that makes doing so "possible." Reply at 5.

None of the cases cited by either party presents a similar situation, where a section of a statute includes language imported verbatim from another statute and which makes little, if any, sense in the context of the statute being construed. "[I]n ascertaining the meaning of a statute, a court should not read language in isolation, but must consider it in the context of the entire statute." *In re Marriage of King*, 802 N.E.2d 1216, 1221–22 (Ill. 2003). Applying these principles of statutory construction, the Court's reading of Section 25(b)(4)(C), in the context of the full text of the Act itself—combined with Director Flanagan's statement that she does" not understand the Act or any other source of law to grant me authority to exercise 'jurisdiction' or undertake 'administrative enforcement,' 820 ILCS 57/25(b)(4)(C), as to alleged violations of the Act beyond the procedural steps outlined in subsection 25(b), which are triggered by a complaint from an interested party," Flanagan Decl. ¶ 12[4]—lead to a finding that this Section does not provide the Director with enforcement power under the Act.

Plaintiffs rely heavily on *Whole Woman's Health*. In that case, Texas enacted a law, the Heartbeat Act, that allowed for private civil actions against physicians for knowingly performing or inducing an abortion in certain circumstances. 595 U.S. at 35–36. A group of plaintiffs sued a Texas judge and court clerk and the executive directors of various medical licensing boards, among others, seeking to enjoin those

---

[4]The Court recognizes, as Plaintiffs point out, that the Director's interpretation of the Act is not binding. Resp. at 8 (citing, *inter alia*, *Kucharek v. Hanaway*, 902 F.2d 513, 519 (7th Cir. 1990) (Attorney General's interpretation of statute was not binding because he may "change his mind . . . and he may be replaced in office")). However, the Court may still consider her interpretation and whether the Illinois Supreme Court is likely to defer to it. *See Kucharek*, 902 F.2d at 519.

S.A. 16

individuals from taking any action to enforce the statute. *Id.* at 36–37. The Supreme Court evaluated each party's role in enforcing the statute to determine whether the *Ex parte Young* exception applied. As to the judge and clerk, the Court found that the law did not implicate the *Ex parte Young* doctrine, as the role of judges and clerks is not fairly characterized as enforcing statutes in the way executive or administrative officials might; rather, judges and their staff "work to resolve disputes" between litigants pursuant to statutes. *Id.* at 39. Indeed, noted the Court, the clerks merely docket the disputes; the law gave them no power to "pass on the substance of the filings they docket" or to refuse a complaint on the merits. *Id.* at 40. On the other hand, the executive licensing directors fell within the scope of *Ex parte Young*'s exception to sovereign immunity, as Texas law imposed a duty on them to enforce a law regulating or prohibiting abortion, a duty preserved by the Heartbeat Act's savings provision. *Id.* at 45–47.

Plaintiffs contend that the Director is like the executive directors of the various medical and health-related boards and commissions in *Whole Women's Health*. But, as stated above, the Heartbeat Act in *Whole Women's Health* explicitly imposed on the "licensing-official defendants a duty to enforce a law that 'regulate[s] or prohibit[s] abortion,' a duty expressly preserved by S. B. 8's saving clause. *Whole Woman's Health*, 595 U.S. at 47. Here, as discussed above, neither the Act nor any other part of the Illinois Compiled Statutes imposes any such duty on the Director. The Court agrees with the Director that she is more akin to the immune court clerks

in *Whole Woman's Health*, as she serves only "to file cases as they arrive." Memo. Dismiss at 10 (citing *Whole Woman's Health*, 595 U.S. at 40).

The out-of-Circuit district court cases cited by Plaintiffs do not move the needle, as those cases are distinguishable. Resp. at 10 (citing *Chamber of Commerce of the United States of America v. Bartolomeo*, 3:22-cv-1373 (D. Conn. 2023); *Minnesota Chapter of Associated Builders and Contractors, Inc. v. Walz*, 24-cv-536 (D. Minn. 2024)). Plaintiffs argue that *Bartolomeo* is persuasive because the district court held that the plaintiffs' claims fell within the *Ex parte Young* exception, even though defendant Commissioner of the Connecticut Department of Labor claimed he would not investigate violations of the law. *Id.* (citing R. 27-1, *Bartolomeo* Tr. at 48:21–49:17). However, as the Director points out in reply, the challenged law provided that, "[t]he Attorney General, upon complaint of the Labor Commissioner, shall institute civil actions to recover the penalties" for violations of the challenged law; the district court relied on that enforcement authority in finding that immunity did not apply. Reply at 12 (citing *Bartolomeo* Tr. at 49:9–12). And Plaintiffs point to the Minnesota district court's finding that it did not matter that defendant Commissioner of the Minnesota Department of Labor and Industry did not have exclusive or primary enforcement authority or pure traditional prosecutorial authority, because the term "enforcement by the department" used in the statute was sufficient to establish a connection between defendant and enforcement. Resp. at 10 (citing R. 27-2, *Walz* Tr. at 37:23–25, 38:1–4, 41:1–19). The Director filed a notice of

supplemental authority after briefing closed,[5] advising that the Eighth Circuit had reversed the district court's decision, finding that, even though the Commissioner had the power to "investigate" employers and the law gave the Commissioner the power "to enforce" the laws in her jurisdiction, where the Commissioner had no independent authority to enforce the Chapter, the court found that the Commissioner's duties were ministerial and she was subject to sovereign immunity. *Minnesota Chapter of Associated Builders & Contractors v. Ellison*, 2025 WL 2526268, at *4 (8th Cir. Sept. 3, 2025). The Court agrees that this case supports the Director's position.

All in all, the Court agrees with the Director that she is not a proper defendant under *Ex parte Young*, as her role in the Act is "ministerial or administrative." While the Court could end its analysis as this juncture, the Court proceeds to address the Director's alternative argument, that she is not threatening enforcement against Plaintiffs.

## II.    Threatened Enforcement

The Director argues in the alternative, that, even if she had enforcement authority under the Act, she is still protected by sovereign immunity because Plaintiffs have not proven an "ongoing violation of federal law." Memo. Dismiss at 10 (quoting *Va. Office for Protection & Advocacy v. Stewart*, 563 U.S. 247, 255 (2011)). That is, Plaintiffs have failed to show, as required, that the Director is "threatening [the plaintiff] with an enforcement action." *Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't Health*, 699 F.3d 962, 983 (7th Cir. 2012). As stated above,

---

[5]The Court gave Plaintiffs an opportunity to respond to the notice of supplemental authority, R. 37, Plaintiffs did not do so.

Director Flanagan states in her declaration that, not only does she not believe that she has the authority to enforce the Act, but she also does not intend to do anything else with respect to the Act, including any investigation or enforcement activities (if she had such authority). Flanagan Decl. ¶¶ 9–12.

In support, the Director cites numerous pre- and post-*Ex parte Young* decisions which all stand for the proposition that, for the exception to sovereign immunity to apply, there must be an impending threat. Memo. Dismiss at 11–12 (citing, *inter alia*, *Fitts v. McGhee*, 172 U.S. 516, 529 (1899) ("[T]he defendants in each of those cases [in which immunity did not apply] were officers of the state, specially charged with the execution of a state enactment alleged to be unconstitutional, but under the authority of which, it was averred, they were committing, or were about to commit, some specific wrong or trespass to the injury of the plaintiffs' rights."); *Sherman v. Cmty. Consol. Sch. Dist. 21 of Wheeling Twp.*, 980 F.2d 437, 441 (7th Cir. 1992) ("Plaintiffs have not articulated any theory under which *Ex parte Young* supports a suit against the Attorney General, who has never threatened the [plaintiffs] with prosecution and as far as we can tell has no authority to do so."); *Minn. RFL Republican Farmer Lab. Caucus v. Moriarty*, 108 F.4th 1035, 1037 (8th Cir. 2024) ("*Ex parte Young* only applies to officials who threaten and are about to commence civil or criminal proceedings to enforce unconstitutional policies."); *Children's Healthcare is a Legal Duty, Inc. v. Deters*, 92 F.3d 1412, 1414, 1416 (6th Cir. 1996) ("[T]he phrase 'some connection with the enforcement of the act,'" as used in *Ex parte Young*, "does not diminish the requirement that the official threaten and be about to commence

20                                                                                    S.A. 20

Case: 1:24-cv-06976 Document #: 38 Filed: 09/30/25 Page 21 of 25 PageID #:721

proceedings.")). Therefore, reasons the Director, because the evidence on the record—Director Flanagan's declaration—shows that she has no authority or intention to enforce the Act, she therefore remains immune from suit. Memo. Dismiss at 13.

In response, Plaintiffs cite numerous cases standing for the proposition that the Director's statement that she does not intend to enforce the Act against Plaintiffs, on its own, does not undermine the fact that there is an ongoing violation of federal law. Resp. at 7 (citing, *inter alia, Babbitt v. UFW Nat'l Union*, 442 U.S. 289, 302 (1979) (finding defendant's contention that the challenged statute had not yet been applied and may never be applied to plaintiffs' actions insufficient to challenge subject-matter jurisdiction where the statute on its face proscribed those actions); *Rodgers v. Bryant*, 942 F.3d 451, 455 (8th Cir. 2019) (a government official's assurances that she will not enforce a statute cannot, by themselves, deprive a court of subject-matter jurisdiction because they "do not rule out the possibility that [she] will change [her] mind and enforce the law more aggressively in the future."). Plaintiffs also point to several Supreme Court and Seventh Circuit cases in which the courts found standing to exist where a statute provided a private right of action, as does the Act. *Id.* at 9–10 (citing *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 164 (2014) (the credible threat of enforcement was "bolstered by the fact that authority to file a complaint with the Commission is not limited to a prosecutor or an agency"); *303 Creative LLC v. Elenis*, 600 U.S. 570, 583 (2023) (credible threat of enforcement existed where "anyone in the State [could] file a complaint against [plaintiff] and initiate 'a potentially burdensome administrative hearing' process."); *Brown v. Kemp*,

21                                                                 S.A. 21

86 F.4th 745, 768 (7th Cir. 2023) (standing for a pre-enforcement First Amendment challenge a "hunter harassment law" was supported by the fact that "government authorities are not the only ones who may seek to enforce [it]. Hunters too may . . . decide . . . to enforce the law against plaintiffs.")).

The Director correctly points out in reply, however, that apart from *Whole Women's Health* (which the Court addresses below), none of the cases cited by Plaintiffs address sovereign immunity or the *Ex parte Young* exception. Reply at 7. And, while Article III's injury-in-fact requirement and *Ex parte Young*'s "ongoing violations of federal law" requirement are similar, they are not identical. That is, as the Director notes, standing sets the "irreducible constitutional minimum" and focuses on what "the plaintiff must have suffered," *id.* (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)), while the *Ex parte Young* doctrine asks whether the defendants are "committing, or [are] about to commit, some specific wrong or trespass to the injury of the plaintiffs' rights," *id.* (quoting *Fitts*, 172 U.S. at 529). Even accepting the authority cited by Plaintiffs as persuasive as to the sovereign immunity analysis, the Court nonetheless finds the cases distinguishable here.

First, recall that the Director brings a factual challenge. So, Plaintiffs "bear[] the burden of coming forward with competent proof that [jurisdiction] exists." Memo. Dismiss at 8 (quoting *Apex Digital*, 572 F.3d at 444). In the face of the Director's declaration that she does not plan to enforce the Act against Plaintiffs, Plaintiffs present no evidence to the contrary. Indeed, Plaintiffs' counsel admitted during oral argument on June 11, 2025 that he was not aware of any forthcoming complaints

under the Act against Plaintiffs; nor have Plaintiffs since filed on the docket anything indicating that a complaint has been filed. So, the sole evidence before the Court as to a threat of enforcement is the Director's affidavit.

Second, the cases supporting standing where a statute allows for private enforcement all had more in the record supporting an injury-in-fact than exists here. In *Susan B. Anthony List*, there existed a history of past enforcement of the statute against the plaintiff. 573 U.S. at 164. Similarly, in *303 Creative*, 600 U.S. at 583, the court found standing to exist where the state had "a history of past enforcement against nearly identical conduct." 600 U.S. at 583. And, in *Brown*, the plaintiffs "had encounters with hunters and law enforcement that took them to the brink of being formally charged with violating [the challenged law] while engaging in actions protected by the First Amendment." 86 F.4th at 769. No such history exists here regarding the Act's enforcement generally against employers similarly positioned to Plaintiffs, and certainly not as to Plaintiffs themselves, as discussed above.

As noted above, Plaintiffs rely on *Whole Women's Health*, arguing that it "belies [the Director's] assertion that there must be some imminent threat of enforcement for *Ex parte Young* to apply," as "[t]here, the Court held that the *Ex parte Young* exception applied to executive licensing officials who '*may* . . . take enforcement actions against the petitioners.'" Resp. at 9 (quoting 595 U.S. at 535 (emphasis in Response)). But as the Director states in reply, later in the decision, the Court "agree[d]" with the rule that plaintiffs "must show at least a credible threat of [an enforcement] action against them." 595 U.S. at 47. And, the Court was presented with

a facial challenge, and found that "at the motion to dismiss stage," the plaintiffs had sufficiently alleged that they "will be the target of an enforcement action," which "allow[ed] this suit to proceed." *Id.* at 47–48. Again, here on a factual challenge, Plaintiffs must prove that they "will be the target of an enforcement action" by the Director. *Id.*

Finally, Plaintiffs argue that "a person need not risk arrest or prosecution before bringing a pre-enforcement challenge under the First Amendment because of the danger that vital protected speech will be chilled due to a reasonable fear of prosecution," and therefore sovereign immunity does not apply. Resp. at 11 (citing *ACLU v. Alvarez*, 679 F.3d 583, 591 (7th Cir. 2012); *Goldhamer v. Nagode*, 621 F.3d 581, 586 (7th Cir. 2010)). But again, Plaintiffs cite only Article III standing cases. And, the Supreme Court in *Whole Women's Health* stated in relevant part that it agreed with the principle that, that "to maintain a suit consistent with this Court's *Ex parte Young* and Article III precedents, it is not enough that petitioners feel inhibited or chill[ed] by the abstract possibility of an enforcement action against them," the plaintiffs had done enough to survive a facial motion to dismiss by "plausibly alleg[ing] that S. B. 8 has already had a direct effect on their day-to-day operations." 595 U.S. at 47. Here, to the contrary, Plaintiffs have presented no evidence that the Act has had any affect on their operations.[6] A vague allegation,

---

[6] Plaintiffs' counsel stated at oral argument that Plaintiffs stopped having mandatory meetings because they were concerned about action taken against them, which he "believe[d]" was in Paprocki's declaration. As the Director's counsel noted during oral argument, Paprocki's declaration does not so state, and Plaintiffs have not presented any other evidence supporting that assertion.

unsupported by evidence, that Plaintiffs worry about the Act chilling their speech, is insufficient to satisfy the second element of *Ex Parte Young* in the face of a factual challenge to subject matter jurisdiction.

Accordingly, the Court finds that Plaintiffs' suit is barred against the Director by sovereign immunity. The Court need not address the Director's alternative Article III arguments. Plaintiffs' claims against the Director are dismissed without prejudice based on the doctrine of sovereign immunity under Federal Rule of Civil Procedure 12(b)(1).

## Conclusion

The Court grants the Director's Motion to Dismiss [19]. Plaintiffs' claims against the Director are dismissed without prejudice and without leave to amend based on the doctrine of sovereign immunity under Federal Rule of Civil Procedure 12(b)(1). Civil case terminated.

Date: 9/30/2025

United States District Judge
Franklin U. Valderrama

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| Illinois Policy Institute and the Technology & Manufacturing Association, | |
| Plaintiffs, | Case No. 1:24-cv-06976 |
| v. | Hon. Franklin U. Valderrama |
| Jane R. Flanagan, in her official capacity as Director of the Illinois Department of Labor, | |
| Defendant. | |

## JUDGMENT

IT IS HEREBY ORDERED AND ADJUDGED that Defendant's motion to dismiss, ECF 19, is GRANTED. For the reasons set out in the Court's opinion, ECF 38, Plaintiffs' complaint is hereby DISMISSED without prejudice and without leave to amend on the ground that their claims are barred by sovereign immunity.

IT IS SO ORDERED.

Dated: November 4, 2025

_____
United States District Judge
Franklin U. Valderrama

S.A. 26

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| Illinois Policy Institute and the Technology & Manufacturing Association, | |
| Plaintiffs, | Case No. 1:24-cv-06976 |
| v. | Hon. Franklin U. Valderrama |
| Jane R. Flanagan, in her official capacity as Director of the Illinois Department of Labor, | |
| Defendant. | |

**CONSENT MOTION TO ENTER JUDGMENT**

On September 30, 2025, the Court entered an opinion and order granting Defendant's motion to dismiss, ECF 38, and Plaintiffs have now filed a notice of appeal to the U.S. Court of Appeals for the Seventh Circuit, ECF 39. On October 30, 2025, the Seventh Circuit issued an order asking the parties whether they intend to ask this Court to issue a judgment set out in a separate document. *See* Ex. A (Oct. 30, 2025 Order).

Pursuant to Civil Rule 58(d), Defendant respectfully requests that the Court enter judgment here in a separate document under Rule 58(a). Rule 58(a) generally "requires that a judgment be 'set out in a separate document.'" *Calumet River Fleeting, Inc. v. Int'l Union of Operating Eng'rs, Loc. 150*, 824 F.3d 645, 650 (7th Cir. 2016) (quoting Fed. R. Civ. P. 58(a)). Although there are exceptions to that rule, *see* Fed. R. Civ. P. 58(a)(1)-(5), an opinion granting a motion to dismiss is not one of them, and so a judgment set out in a separate document is required here.

As the Seventh Circuit's order suggests, the Court retains jurisdiction to comply with Rule 58(a) notwithstanding Plaintiffs' filing of a notice of appeal. Where a notice of appeal is filed before the judgment is set out in a separate document, that notice "does not prevent the district court from finishing its work and rendering a final decision." *Wis. Mut. Ins. Co. v. United States*, 441 F.3d 502, 504 (7th Cir. 2006); *see id.* at 504-05 (concluding that district court retained

S.A. 27

jurisdiction to comply with Rule 58(a) after party filed notice of appeal); Fed. R. App. P. 4(a)(2) ("A notice of appeal filed after the court announces a decision or order—but before the entry of the judgment or order—is treated as filed on the date of and after the entry.").

A proposed judgment reflecting the Court's September 30 opinion will be submitted to the Court.

Plaintiffs consent to this motion.

Dated: November 4, 2025        Respectfully submitted,

Alex Hemmer                       KWAME RAOUL,
R. Henry Weaver                 Attorney General of Illinois, on behalf of
Office of the Illinois Attorney General    Defendant Jane R. Flanagan
115 S. LaSalle St.
Chicago, IL 60603
*alex.hemmer@ilag.gov*             By:   */s/ Alex Hemmer*
(312) 814-3000                       Deputy Solicitor General

Case: 1:24-cv-06976 Document #: 46 Filed: 11/04/25 Page 1 of 1 PageID #:772

# IN THE UNITED STATES DISTRICT COURT
## FOR THE
## NORTHERN DISTRICT OF ILLINOIS

Illinois Policy Institute

Plaintiff(s),

v.

Illinois Department of Labor, et. al.

Defendant(s).

Case No. 1:24-cv-06976
Judge Franklin U. Valderrama

## JUDGMENT IN A CIVIL CASE

Judgment is hereby entered (check appropriate box):

☐    in favor of plaintiff(s)
and against defendant(s)
in the amount of $

     which ☐ includes    pre–judgment interest.
            ☐ does not include pre–judgment interest.

Post-judgment interest accrues on that amount at the rate provided by law from the date of this judgment.

Plaintiff(s) shall recover costs from defendant(s).

☐    in favor of defendant(s)
and against plaintiff(s)

Defendant(s) shall recover costs from plaintiff(s).

☑    other: For the reasons stated in the motion, and under Fed. R. Civ. P. 58(a), the Court grants the parties' consent motion to enter judgment [44].

This action was *(check one)*:

☐ tried by a jury with Judge                        presiding, and the jury has rendered a verdict.
☐ tried by Judge                  without a jury and the above decision was reached.
☑ decided by Judge   Franklin U. Valderrama      on a motion to dismiss.

Date: 11/4/2025           Thomas G. Bruton, Clerk of Court

                          Jonathan Martinez        , Deputy Clerk

S.A. 29

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ILLINOIS POLICY INSTITUTE and THE
TECHNOLOGY & MANUFACTURING
ASSOCIATION,

               Plaintiffs,

v.

JANE R. FLANAGAN, *in her official
capacity as Director of the Illinois
Department of Labor*,

               Defendant.

Case No. 1:24-cv-06976

Hon. Judge Franklin U. Valderrama

**First Amended Complaint**

1.     The First Amendment protects the free-speech rights of both employees and employers—including the employer's right to speak to employees about matters of importance to the employer.

2.     Nonetheless, the State of Illinois has enacted a law, misleadingly titled the "Worker Freedom of Speech Act," that forbids employers from speaking to their employees about "religious or political matters" if listening or attending a meeting in which such matters are communicated is a condition of their employment—even when such matters are relevant to the employer's business.

3.     And the Act defines "political matters" broadly—to encompass not only speech about campaigns and elections, but also speech "relating to . . . proposals to change legislation, proposals to change regulations, proposals to change public policy, and the decision to join or support any political party or political, civil, community, fraternal, or labor organization."

1

4. Plaintiff Illinois Policy Institute ("the Institute") is a 501(c)(3) nonprofit organization that engages in research related to public policy from a perspective that favors, among other things, civil and personal liberties; effective, efficient, honest, and transparent government; limited government; free markets; and workers' freedom to choose whether to join a labor union.

5. The Institute regularly conducts mandatory staff meetings at which the organization's views on questions of public policy are expressed.

6. Plaintiff Technology & Manufacturing Association ("TMA") is a 501(c)(6) independent trade organization that focuses on assisting and promoting small and mid-size manufacturers, by, among other things, providing information, training, resources, and advocacy for and on behalf of its members.

7. TMA brings this suit on behalf of its manufacturing business members, some of whom communicate religious and political matters to their employees in mandatory meetings or as a condition of those employees' employment.

8. The Act now makes Plaintiffs' mandatory meetings that include political or religious matters unlawful.

9. This restriction on the Institute's ability to speak to its employees about the very subject matter of the organization's mission violates the Institute's right to free speech under the First Amendment.

10. And the restriction on TMA's members' ability to speak to their employees about religious or political matters if listening to such communications are a

2

condition of employment violates TMA's members' free speech rights under the First Amendment.

11.     Plaintiffs therefore seeks declaratory relief and preliminary and permanent injunctive relief against the Director of the Illinois Department of Labor—the agency charged with enforcing the Act—to protect its right to freedom of speech.

## Parties

12.     Plaintiff Illinois Policy Institute is a 501(c)(3) nonprofit organization incorporated in Illinois, with its office in Chicago, Illinois.

13.     Plaintiff the Technology & Manufacturing Association is a 501(c)(6) organization incorporated in Illinois, with its office in Schaumburg, Illinois. TMA brings this suit based on the associational standing of its members.

14.     Defendant Jane R. Flanagan is the Director of the Illinois Department of Labor and is sued in her official capacity. The Illinois Department of Labor is the Illinois state agency charged with enforcing the "Worker Freedom of Speech Act."

## Jurisdiction and Venue

15.     This case raises claims under the First and Fourteenth Amendments of the U.S. Constitution and 42 U.S.C. § 1983. The Court has subject-matter jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

16.     Venue is proper because a substantial portion of the events giving rise to the claims occurred in the Northern District of Illinois. 28 U.S.C. § 1391(b)(2).

S.A. 32

## Facts

### Illinois's Ban on Employer Political and Religious Speech

17.    Illinois Senate Bill 3649, enacted as Public Act 103-0722 and effective January 1, 2025, prohibits employers from "tak[ing] any adverse employment action" against an employee who refuses to attend meetings or receive communications from the employer intended "to communicate the opinion of the employer about religious matters or political matters." § 15(1).

18.    The Act provides for enforcement by several parties: not only aggrieved employees, but also that Illinois Department of Labor or any other "interested party."

19.    Section 20 of the Act allows any "aggrieved employee" to bring a civil action to enforce its provisions. In such an action, a court may award "all appropriate relief, including injunctive relief, reinstatement to the employee's former position or an equivalent position, back pay, [and] reestablishment of any employee benefits." § 20. The court may also award attorney's fees and costs to a prevailing employee. *Id*.

20.    Even if an "aggrieved employee" does not bring an action, the Act further empowers the Department of Labor to enforce the Act and "institute the actions for penalties" under the Act, including a civil penalty of $1,000 for each violation payable to the Department. Each employee subject to the violation of the Act constitutes a separate violation. § 25.

21.    In addition, the Act allows any "interested party" to submit a complaint with the Department "[u]pon a reasonable belief that an employer" violated the Act.

S.A. 33

"Interested party" is defined as "an organization that monitors or is attentive to compliance with public or worker safety laws, wage and hour requirements, or other statutory requirements." § 10.

22.     After the Department issues a right to sue letter, or 180 days after the service of the complaint, the interested party may initiate a civil action for penalties against the employer. "An interested party who prevails in a civil action shall receive 10% of any statutory penalties assessed, plus any attorney's fees and expenses in bringing the action." § 25.

23.     The Act also requires an employer, within 30 days after the effective date of the Act, to post a notice of employee rights under the Act. § 10.

24.     The Act defines "religious matters" as "matters relating to religious belief, affiliation, and practice and the decision to join or support any religious organization or association." § 10.

25.     The Act defines "political matters" as "matters relating to elections for political office, political parties, proposals to change legislation, proposals to change regulations, proposals to change public policy, and the decision to join or support any political party or political, civic, community, fraternal, or labor organization." § 10.

26.     The Act provides several exceptions.

27.     Employers may communicate with their employees about religious and political matters, but only if such communication is "voluntary," § 35(2)—meaning that the action is not incentivized by a positive change in any employment

5

S.A. 34

condition, including any compensation or benefit and that the action is not taken under threat of a negative change in any employment condition, § 10.

28.     The Act also allows employers to communicate "information that is necessary for the employees to perform their required job duties" to employees. § 35(3).

29.     The Act exempts certain employers that communicate about political matters: "political organization[s,] political party organization[s,] caucus organization[s,] candidate's political organization[s, or] not-for-profit organization[s] that [are] exempt from taxation under Section 501(c)(4), 501(c)(5), or 501(c)(6) of the Internal Revenue Code." § 35(6).

30.     The Act does not, however, exempt 501(c)(3) organizations.

31.     The Act also exempts the General Assembly and State or local legislative or regulatory bodies with respect to communications of the employer's proposals to change legislation, regulations, or public policy. § 35(7).

32.     The Act also exempts religious organizations from the provisions of the Act with respect to communications of the employer's religious beliefs, practices, or tenets. § 35(7). The Act does not define "religious organization."

### Injury to Plaintiff Illinois Policy Institute

33.     The Institute is a 501(c)(3) organization and therefore not exempt.

34.     The Act bans the Institute from communicating with its employees during mandatory meetings about "proposals to change legislation, proposals to change

6

regulations, [and] proposals to change public policy"—even though creating such proposals is one of the Institute's principal purposes.

35.     The Institute is a research organization that publishes policy research on a variety of political topics, including the state budget, jobs, labor, pensions, education, and criminal justice.

36.     The Institute holds mandatory staff meetings every week for all staff, with no exceptions made for job title or position.

37.     The Institute also has regularly scheduled team meetings and holds strategy meetings scheduled as needed that are mandatory for certain staff.

38.     The Institute holds two all-staff retreats each year, and all staff, regardless of position, are required to attend.

39.     At the mandatory meetings and mandatory retreats, the Institute has discussed topics such as the Workers' Rights Amendment, the proposed real estate transfer tax in Chicago, and the Invest in Kids tax credit scholarships.

40.     It is important for the functioning of the Institute to communicate about political matters—including discussions of any legislation that may be crafted by the General Assembly—with its employees and ensure that their employees listen to such communications. Often the most efficient way of doing so is by holding mandatory meetings.

41.     The Institute believes it is important to discuss its work with all its employees, regardless of whether a specific employee is working on a specific topic. Such discussions improve staff morale and team cohesion and enable staffers not

working on a specific policy-related matter to express their ideas or new perspective on that matter.

42.     The Institute plans to continue holding mandatory meetings and retreats in which changes to public policy and legislation are discussed.

### Injury to Plaintiff Technology & Manufacturing Association

43.     TMA is a trade organization that partners with small and midsize manufacturers to assist them in maintaining and growing their businesses.

44.     Although TMA itself is exempt from the Act as a 501(c)(6) nonprofit, its constituent members are not.

45.     Some of TMA's members are owned by individuals with deep religious convictions, who seek to implement their faith in their work, and therefore sometimes hold meetings, or communicate with their employees, about their religious views—including, sometimes, in mandatory meetings or in communications that their employees are required to receive or hear as a condition of their employment.

46.     Some of TMA's members are businesses that believe that unionization of their employees would be against the interest of the business and its employees, and either have communicated this position to their employees in mandatory meetings or would do so if some employees sought to unionize.

47.     Many of TMA's members discuss political matters, as defined by the Act, with employees in mandatory meetings or in communications that their employees must listen to. They do so for a variety of reasons, including because such political

S.A. 37

matters may affect or be relevant to their business or to the employees directly or indirectly.

## Count I

### The ban on employer speech to employees about "political matters" in P.A. 103-0722 violates the First Amendment's guarantee of freedom of speech.

48.     The allegations contained in all preceding paragraphs are incorporated herein by reference.

49.     "[A]bove all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter or its content." *Police Department of Chicago v. Mosley,* 408 U.S. 92, 95-96 (1972).

50.     A law is content based if the law "'on its face' draws distinctions based on the message a speaker conveys." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (*quoting Sorrell v. IMS Health Inc.*, 564 U.S. 552, 563–64 (2011)).

51.     "Content-based regulations are presumptively invalid" and thus subject to strict scrutiny analysis. *R.A.V. v. City of St. Paul,* 505 U.S. 377, 382 (1992); *United States v. Alvarez,* 567 U.S. 709, 717 (2012) (plurality opinion). Content-based restrictions on political and religious speech warrant such scrutiny because they "are especially likely to be improper attempts to value some forms of speech over others, [and] are particularly susceptible to being used by the government to distort public debate." *City of Ladue v. Gilleo*, 512 U.S. 43, 60 (1994) (O'Connor, J., concurring).

52.     The Act is a content-based regulation because it regulates speech based on its content: an employer is prohibited from communicating political speech or

religious speech to its employees at mandatory meetings or by requiring the employees to listen to such speech.

53. To know whether an employer violates the Act, the government must discern the content of the employer's speech.

54. Defendant has no compelling governmental interest in prohibiting employers from communicating political or religious matters to employees.

55. The Act is not narrowly tailored to serve any purported compelling government interest.

56. And the Act is not the least restrictive means of achieving any purported compelling government interest.

57. The Act therefore violates the Plaintiffs' First Amendment rights, and they are entitled to injunctive relief because they are irreparably harmed and have no adequate remedy at law.

## Count II

### The National Labor Relations Act Preempts the Act's ban on employer speech to employees about labor organizations.

58. The allegations contained in all preceding paragraphs are incorporated herein by reference.

59. The National Labor Relations Act ("NLRA") "is a comprehensive code passed by Congress to regulate labor relations in activities that affect interstate and foreign commerce." *Cannon v. Edgar*, 33 F.3d 880, 883 (7th Cir. 1994). It "reflects congressional intent to create a uniform, national body of labor law interpreted and administered by a centralized agency, the National Labor Relations Board." *Id.*

S.A. 39

60.     "The NLRA enumerates unfair labor practices by both employees and employers, 29 U.S.C. § 158(a) and (b)," which include employer interference with the right to self-organization and collective bargaining, refusal by an employer to bargain collectively with a union, and bargaining in good faith. *Cannon*, 33 F.3d at 883.

61.     The Supreme Court has developed two doctrines under which the NLRA can preempt state or local laws. One, "*Garmon* preemption, forbids state and local regulation of activities that the NLRA protects or prohibits or arguably protects or prohibits." *Id*. The other, "*Machinists* preemption, prohibits state and municipal regulations of areas that Congress left to the free play of market forces." *Id*.

62.     The NLRA protects—or at least arguably protects—employers' right to speak to their employees about unionization at mandatory meetings. *See Babcock & Wilcox Co.*, 77 N.L.R.B. 577 (1948); 29 U.S.C. § 158(c) ("The expressing of any vides, argument, or opinion, or the dissemination thereof . . . shall not constitute or be evidence of an unfair labor practice . . . .").

63.     Therefore, the NLRA preempts any state law that would restrict employers' right to speak to their employees about unions—including the Act Plaintiffs challenge here.

64.     A state or local law that is preempted by the NLRA violates the Supremacy Clause of the United States Constitution. *See Cannon*, 33 F.3d at 883.

S.A. 40

65.     Therefore, to the extent that the Act prohibits employers from speaking to their employees about unions, the Act is preempted by the NLRA and violates the Supremacy Clause.

### Prayer for Relief

WHEREFORE, Plaintiffs respectfully request that this Court grant the following relief:

A.     Enter a judgment declaring that P.A. 103-0722's prohibition on employer speech to employees about "political matters" at mandatory meetings violates the First Amendment to the United States Constitution, both on its face and as applied to Plaintiff Illinois Policy Institute and Plaintiff TMA's members.

B.     Enter a judgment declaring that P.A. 103-0722's prohibition on employer speech to employees about "religious matters" at mandatory meetings violates the First Amendment on its face and as applied to Plaintiff TMA's members.

C.     Enter a judgment declaring that, to the extent that P.A. 103-0722 restricts employer speech related to labor unions, it is preempted by the National Labor Relations Act and therefore violates the Supremacy Clause of the United States Constitution.

D.     Preliminarily and permanently enjoin Defendant from enforcing P.A. 103-0722;

S.A. 41

E.   Award Plaintiffs their reasonable costs, expenses, and attorneys' fees

pursuant to any applicable law; and

F.   Award Plaintiffs any additional relief the Court deems just and proper.

Dated: October 30, 2024

Respectfully submitted,

**Illinois Policy Institute *and*
Technology & Manufacturing
Association**

By: /s/ James McQuaid
One of their Attorneys

Jacob Huebert
Jeffrey M. Schwab
James McQuaid
Liberty Justice Center
7500 Rialto Blvd
Suite 1-250
Austin, TX 78735
512-481-4400
jhuebert@ljc.org
jschwab@ljc.org
jmcquaid@ljc.org

S.A. 42